489 P.3d 752
The PEOPLE of the State of Colorado, Petitioner/Cross-Respondent,
IN the INTEREST OF T.B., Respondent/Cross-Petitioner
Supreme Court Case No. 19SC690 Supreme Court of Colorado.
June 28, 2021
Attorneys for Petitioner/Cross-Respondent: Philip J. Weiser, Attorney General, Joseph G. Michaels, Senior Assistant Attorney General, Denver, Colorado
Attorneys for Respondent/Cross-Petitioner: Johnson & Klein, PLLC, Gail K. Johnson, Boulder, Colorado
Attorneys for Amici Curiae Colorado Constitutional, Criminal, and Juvenile Law Scholars: University of Denver Sturm College of Law, Sara Hildebrand, Denver, Colorado
En Banc
JUSTICE MÁRQUEZ delivered the Opinion of the Court.
¶1 T.B. committed two sexual offenses as a minor—the first when he was eleven years old and the second when he was fifteen. Because he was twice adjudicated delinquent for unlawful sexual behavior, the Colorado Sex Offender Registration Act, §§ 16-22-101 to - 115, C.R.S. (2020) ("CSORA"), requires T.B. to register as a sex offender for the remainder of his natural life. Now an adult, T.B. seeks review of the juvenile court's denial of his petition to deregister, arguing that CSORA's mandatory lifetime sex offender registration requirement for offenders with multiple juvenile adjudications violates the Eighth Amendment's prohibition on cruel and unusual punishment. We agree.
¶2 Mandatory lifetime sex offender registration brands juveniles as irredeemably depraved based on acts committed before reaching adulthood.1 But a wealth of social science and jurisprudence confirms what common sense suggests: Juveniles are different. Minors have a tremendous capacity to change and reform. As such, mandating lifetime sex offender registration for juveniles without providing a mechanism for individualized assessment or an opportunity to deregister upon a showing of rehabilitation is excessive and violates the Eighth Amendment. Accordingly, we affirm in part and reverse in part the judgment of the court of appeals and remand with instructions to order a new hearing on T.B.'s petition to deregister.2 I. Background
A. The Development of Sex Offender Registries and Their Applicability to Juveniles
1. Sex Offender Registries Nationally
¶3 Sex offender registries emerged relatively recently as a direct result of several well-publicized crimes involving child victims in the late 1980s and early 1990s. Nichols v. United States, ––– U.S. ––––, 136 S. Ct. 1113, 1116, 194 L.Ed.2d 324 (2016). In response to these incidents, states around the country began enacting sex offender registration laws. Id.3 Congress followed suit in 1994, enacting the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act. See Pub. L. No. 103-322, § 170101, 108 Stat. 1796, 2038-42 (1994) (codified at 42 U.S.C. §§ 14071 -73) (repealed 2006).
¶4 The Jacob Wetterling Act required each state to establish a sex offender registration program that met specified minimum standards. § 170101(a)(1), 108 Stat. at 2038. States that failed to do so within three years of enactment were subjected to a ten-percent reduction in certain federal law enforcement funding. § 170101(f)(1), (2)(A), 108 Stat. at 2042. The registries contemplated by the Act were initially designed as tools for law enforcement agencies. Registration records were "treated as private data" and were kept confidential, although discretionary dissemination of registration information was permitted to the extent necessary to protect the public. § 170101(d), 108 Stat. at 2041-42. Two years later, however, Congress amended the Jacob Wetterling Act to mandate disclosure of sex offender registration information as necessary to protect the public. See Megan's Law, Pub. L. No. 104-145, sec. 2, § 170101(d)(2), 110 Stat. 1345, 1345 (1996).
¶5 In 2006, Congress replaced the Jacob Wetterling Act with the Sex Offender Registration and Notification Act, Pub. L. No. 109-248, §§ 101-55, 120 Stat. 587, 590-611 (originally codified at 42 U.S.C. §§ 16901 -62, transferred to 34 U.S.C. §§ 20901 -62) ("SORNA").4 Like the Jacob Wetterling Act, SORNA requires each state to maintain a sex offender registry. 34 U.S.C. § 20912(a) (2018). But SORNA substantially expands the scope of information included on each registry to encompass a wide range of personal information about each registrant, including the registrant's name, address, license plate number and description of any vehicle, a physical description of the registrant, a current photograph and photocopy of a valid form of identification, a set of fingerprints and palm prints, a DNA sample, and information regarding the underlying offense. 34 U.S.C. § 20914 (2018). Each state must make this information available online to the public, with some limited mandatory and discretionary exclusions. 34 U.S.C. § 20920 (2018).
¶6 SORNA also establishes a comprehensive national registration system, known as the National Sex Offender Registry, 34 U.S.C. § 20921 (2018), and a community notification program, 34 U.S.C. § 20923 (2018). SORNA required each state to implement a compliant sex offender registration program within three years of enactment. 34 U.S.C. § 20926(a)(1) (2018). Similar to the Jacob Wetterling Act, states that failed to substantially comply were subjected to a ten-percent reduction in certain federal law enforcement funding. 34 U.S.C. § 20927 (2018).
¶7 Notably, SORNA covers a broader range of offenders by employing a three-tier offender classification, 34 U.S.C. § 20911(2) - (4) (2018), and by expanding the definition of "sex offense" to encompass a greater number of offenses, § 20911(5), (7). And unlike the Jacob Wetterling Act, under which the states had discretion regarding "whether and how to register juveniles," Amy E. Halbrook, Juvenile Pariahs, 65 Hastings L.J. 1, 22 (2013), SORNA expressly applies to individuals who were "adjudicated delinquent as a juvenile" for certain offenses and who were at least fourteen years old at the time of the offense, 34 U.S.C. § 20911(8).
¶8 In short, SORNA completely "redefined the landscape" of sex offender registration. Catherine L. Carpenter & Amy E. Beverlin, The Evolution of Unconstitutionality in Sex Offender Registration Laws, 63 Hastings L.J. 1071, 1078 (2012). It applies to both juveniles and adults and "include[s] an ever-increasing number of registerable offenses, lengthening durational requirements, expanded personal information reporting requirements, harsher residency restrictions, the introduction of the GPS tracking device, and the systematic elimination of individualized assessment as a touchstone." Id. at 1079.
2. Sex Offender Registries in Colorado
¶9 The General Assembly enacted Colorado's first sex offender registry in 1991. See ch. 69, sec. 1, § 18-3-412.5, 1991 Colo. Sess. Laws 393, 393-95. Under this original scheme, offenders were required to register only upon conviction of certain delineated sex offenses committed against children. Id. at 393.5 Notably, the registry was confidential; it was not "open to inspection by the public or any person other than any law enforcement officer." Id. at 394.
¶10 This changed in 2002 with the enactment of CSORA, a comprehensive registration and community notification scheme. See ch. 297, sec. 1, §§ 16-22-101 to -114, 2002 Colo. Sess. Laws 1157, 1157-78.6 CSORA requires certain offenders to register as sex offenders annually and in person in each jurisdiction in which the offender resides. See § 16-22-108(1)(a)(II), (1)(b), C.R.S. (2020).7 Registrants are required to disclose, among other things, their name (including any aliases), date of birth, address, and place of employment; the name and address of any postsecondary education institution at which they are enrolled; and a description, vehicle identification number, license plate number, and registration number of each vehicle they own. § 16-22-109(1), C.R.S. (2020). Registrants must update this information within five days of any change to the individual's residence, place of employment, enrollment at a postsecondary education institution, volunteer work location, email address, or online identity, among other things. § 16-22-108(3). And as part of the annual registration process, registrants must "sit for a current photograph" and provide an updated "set of fingerprints to verify the [registrant's] identity." § 16-22-108(6).
¶11 CSORA expressly applies to juveniles who have been adjudicated delinquent for unlawful sexual behavior. § 16-22-103(4), C.R.S. (2020). Juvenile offenders are subject to the same registration and community notification requirements as adult offenders with one exception: The Colorado Bureau of Investigation ("CBI") may not publish juvenile information, including a juvenile's status as a sex offender, on its website. See § 16-22-111(1), (1.5) C.R.S. (2020). That said, local law enforcement agencies may post such information if the juvenile has a second or subsequent adjudication involving unlawful sexual behavior or a crime of violence, § 16-22-112(2)(b)(III), C.R.S. (2020), or "was adjudicated for an offense that would have been a felony if committed by an adult and has failed to register as required," § 16-22-112(2)(b)(IV).
¶12 Moreover, upon request, local law enforcement agencies must release registry information, including juvenile information, to any person living in the agency's jurisdiction. § 16-22-112(2)(a). Local agencies also have discretion to release such information to any person living outside the agency's jurisdiction. § 16-22-112(3)(b). In addition, juvenile information is included in "a statewide central registry," § 16-22-110(1), C.R.S. (2020), which is available upon request and includes, at a minimum, each juvenile's name, address, date of birth, photograph, and underlying offense, § 16-22-110(6)(c), (f). Finally, "private, third-party businesses have emerged that republish registrants' personal information on the internet with no limitation or regulation on republication." Millard v. Camper, 971 F.3d 1174, 1179 (10th Cir. 2020).
¶13 Although the registration requirement applies indefinitely, a court may, upon petition of removal by a registrant, enter an order discontinuing registration. See § 16-22-113(1), C.R.S. (2020). In determining whether to enter such an order, the sole criterion is "whether the person is likely to commit a subsequent offense of or involving unlawful sexual behavior." § 16-22-113(1)(e). The court shall base its determination on recommendations from the person's probation or parole officer, treatment provider, the prosecuting attorney, and the presentence investigation report, and shall consider statements submitted by the victim. Id.
¶14 Importantly, certain individuals— including those who have more than one conviction or adjudication for unlawful sexual behavior—are not eligible to petition for discontinuation of registration. See § 16-22-113(3)(c) (excluding "[a]ny adult who has more than one conviction or adjudication for unlawful sexual behavior"); § 16-22-103(4) ("[A] person may petition the court for an order to discontinue the duty to register ... only if the person has not subsequently received a disposition for, been adjudicated a juvenile delinquent for, or been otherwise convicted of any offense involving unlawful sexual behavior."). Such individuals are subject to the registration requirements "for the remainder of their natural lives." § 16-22-113(3). This is true regardless of whether the underlying offenses were committed when the registrant was a juvenile or an adult. See id.; § 16-22-103(4).
B. Facts and Procedural History
¶15 In 2001, T.B. pleaded guilty to unlawful sexual contact—an offense he committed when he was eleven years old—and was adjudicated delinquent. He successfully completed probation, during which his treatment focused on family interactions and interventions. However, T.B. received only minimal offense-specific treatment, and his probation officer later admitted that the probation department "didn't really have a whole lot ... to go on" and "[was]n't in the position to provide [T.B.] with what he needed" at that time. In 2005, when T.B. was fifteen years old, he was again adjudicated delinquent after he pleaded guilty to sexual assault. This time, T.B. received offense-specific treatment and successfully completed probation.
¶16 In 2010, T.B. filed a pro se petition to discontinue sex offender registration in both cases. At an evidentiary hearing, T.B. and his former probation officer testified regarding T.B.'s rehabilitation and the impact of registration on his life. T.B.'s probation officer testified that T.B. did a "phenomenal job" at the treatment facility. She described T.B. as a "very compassionate" and "empathetic young man," who "struggled a lot with his inner demons" when he was younger and whose juvenile offenses were in part the result of his parents' negative influence, including their gang involvement. She explained that T.B. "took advantage of th[e] opportunity" provided by his second treatment and "has changed from the person he was at eleven to the person he is today." In short, she said that T.B. "has made a complete turnaround from the time that he was eleven years old." But she said that T.B. "can't seem to get a better job" or an apartment "because of the scrutiny that he's under when he applies." As T.B. himself explained, he was working in management at a fast-food restaurant and was being considered for a promotion, but his annual registration obligation was "holding [him] back" from career advancement.
¶17 At the close of the hearing, the juvenile court stated:
To be honest with you, I think [T.B.] has earned the right not to have to register. It is clear to me ... the concerns related to [T.B.'s] prior offenses no longer exist, and he is not a risk to sexually reoffend at this point in time because of all of the work that he's done.
The court therefore granted the petition as to the 2005 case. But the court expressed doubt that it could discontinue registration in the 2001 case under section 16-22-113 given T.B.'s 2005 adjudication. It requested additional briefing on the issue; when both parties failed to submit such briefing, the juvenile court denied T.B.'s petition to discontinue registration in the 2001 case.
¶18 In 2015, T.B., through counsel, filed a second petition to discontinue registration, arguing, as relevant here, that mandatory lifetime sex offender registration for offenses committed as a juvenile violated due process and constituted cruel and unusual punishment. Relying primarily on People in Interest of J.O., 2015 COA 119, ¶¶ 21-30, 383 P.3d 69, 73-75 (holding that sex offender registration under section 16-22-103 does not constitute punishment for purposes of the Eighth Amendment, even as applied to juveniles), the juvenile court denied T.B.'s petition. In so doing, the court acknowledged "that registering as a sex offender is a personal burden for the juvenile" but explained that any relief must come from the legislature or a higher court.
¶19 A split division of the court of appeals reversed, concluding that CSORA's juvenile mandatory lifetime registration requirement constitutes punishment for Eighth Amendment purposes. People in Int. of T.B., 2019 COA 89, ¶ 46, ––– P.3d ––––. Applying the two-part intent-effects test set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the majority first concluded that, while "[t]here is some textual indication in CSORA that the legislature recognized that the registration requirement may be punitive," the legislature did not intend the registration requirement to function as a punishment. T.B., ¶ 22.
¶20 Nevertheless, the majority went on to hold that the juvenile mandatory lifetime registration requirement is so punitive in effect as to override the legislature's intent. First, it explained, "the effect of requiring a juvenile to register as a sex offender for life is reminiscent of traditional forms of punishment," particularly due to the "dissemination of information" regarding "a juvenile's criminal history [that] would not otherwise be publicly available." Id. at ¶ 34. Second, it determined that "CSORA's lifetime registration requirement promotes the traditional aims of punishment," id. at ¶ 38, because "it imposes a sanction for past conduct" and "does not provide a mechanism by which an offender can ‘reduce or end registration based upon a showing that the offender is no longer a threat to the community,’ " id. (quoting Starkey v. Okla. Dep't of Corr., 305 P.3d 1004, 1028 (Okla. 2013) ). Third, it reasoned that "for juveniles, the behavior to which CSORA applies is already a crime" in that the "lifetime registration requirement sweeps in only those who have been adjudicated for committing past crimes—and, once the requirement to register for life is imposed, it does so without regard to whether he or she is likely to reoffend." Id. at ¶ 39. Finally, the majority acknowledged "that there is a rational connection between CSORA's registration requirement and public safety." Id. at ¶ 40. But it concluded that the registration requirement is "overly inclusive—and therefore excessive"—in light of this purpose, id. at ¶ 44, because "once the requirement to register for life is imposed, it remains in effect without regard to whether the registrant is a continuing danger to the public," id. at ¶ 45.
¶21 Having concluded that juvenile mandatory lifetime sex offender registration constitutes punishment, the division remanded the case to the juvenile court for further proceedings regarding the "fact-intensive inquiry" of whether such punishment is cruel and unusual under the Eighth Amendment. Id. at ¶ 49.8 ¶22 Dissenting, Judge Webb highlighted that, without exception, other divisions of the court of appeals have concluded that CSORA's registration requirement is not a punishment, id. at ¶ 61 (Webb, J., dissenting), and that those divisions were due "considerable deference," id. at ¶ 62 (quoting People v. Smoots, 2013 COA 152, ¶ 20, 396 P.3d 53, 57 ). He therefore declined to revisit all but one of the Mendoza-Martinez factors: "whether the sanction appears excessive in relation to the alternative purposes assigned." Id. at ¶ 71.
¶23 As for that factor, Judge Webb articulated three reasons for concluding that CSORA's registration requirement is not an excessive sanction. First, "[t]he determination whether an offender is likely to reoffend is an inexact science." Id. at ¶ 72 (alteration in original) (quoting State v. Yost, No. 90275, 2008 WL 2833291, at *2 (Ohio Ct. App. July 24, 2008) ). Second, in addition to protecting the public from individual offenders, the registration requirement assists law enforcement officers, who "may legitimately choose to start investigating a sex offense with a known sex offender in the vicinity of the crime." Id. at ¶ 73. And finally, "providing notice to the public about a sex offender who has committed a crime requiring registration is informational." Id. at ¶ 74. Because there is an "inherent imprecision in predicting that offender's future criminality," Judge Webb reasoned, providing registration information to the public allows each citizen to "make their own risk assessments." Id.
¶24 The People petitioned this court for certiorari review, and T.B. cross-petitioned for certiorari review. We granted both petitions.9 II. Legal Principles
A. Standard of Review ¶25 We review the constitutionality of statutes de novo. Lucero v. People , 2017 CO 49, ¶ 13, 394 P.3d 1128, 1131. Under our doctrine of separation of powers, statutes are entitled to a presumption of constitutionality. People v. Graves, 2016 CO 15, ¶ 9, 368 P.3d 317, 322. Declaring a statute unconstitutional is thus "one of the gravest duties impressed upon the courts." Rocky Mountain Gun Owners v. Polis, 2020 CO 66, ¶ 30, 467 P.3d 314, 323 (quoting Graves, ¶ 9, 368 P.3d at 322 ). However, we may not shirk this duty when a party has demonstrated that a statute is unconstitutional beyond a reasonable doubt. See id.
B. Juveniles and the Eighth Amendment ¶26 The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.10 At its core, the Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions." Roper v. Simmons , 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (citing Atkins v. Virginia, 536 U.S. 304, 311, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ). That right "flows from the basic ‘precept of justice that punishment for crime should be graduated and proportioned’ to both the offender and the offense." Miller v. Alabama, 567 U.S. 460, 469, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (quoting Roper, 543 U.S. at 560, 125 S.Ct. 1183 ). The U.S. Supreme Court has instructed that the Eighth Amendment should be construed "less through a historical prism than according to ‘the evolving standards of decency that mark the progress of a maturing society.’ " Id. (quoting Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ). Thus, while "[t]he standard itself remains the same," the application of that standard "must change as the basic mores of society change." Graham v. Florida, 560 U.S. 48, 58, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (quoting Kennedy v. Louisiana, 554 U.S. 407, 419, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) ). ¶27 Eighth Amendment challenges generally fall into one of two categories: (1) challenges to the excessiveness of a particular punishment for a particular offender, see id. at 59, 130 S.Ct. 2011, or (2) categorical challenges to a particular punishment "as it applies to an entire class of offenders who have committed a range of crimes," id. at 61, 130 S.Ct. 2011. It is in this latter category of cases that the U.S. Supreme Court has, in recent years, "specially focused on juvenile offenders." Miller, 567 U.S. at 470, 132 S.Ct. 2455. ¶28 In a trio of cases— Roper , Graham , and Miller —the Supreme Court determined that sentencing practices that are constitutionally permissible in the context of adult offenders may violate the Eighth Amendment when applied to juveniles. Roper established that the death penalty cannot be constitutionally applied to juvenile offenders, 543 U.S. at 575, 125 S.Ct. 1183, while Graham held that the same is true for sentences of life imprisonment without the possibility of parole for non-homicide offenses, 560 U.S. at 75, 130 S.Ct. 2011. The last of the three cases, Miller , established that, even for homicide offenses, a juvenile may not be subject to a mandatory sentence of life without parole, and that the sentencing authority must take into account the mitigating qualities of "an offender's age and the wealth of characteristics and circumstances attendant to it." 567 U.S. at 476, 132 S.Ct. 2455. Taken together, these cases "establish that children are constitutionally different from adults for purposes of sentencing." Id. at 471, 132 S.Ct. 2455. Put simply, the U.S. Supreme Court has made clear that "youth matters" in determining the appropriateness of sanctions. Id. at 473, 132 S.Ct. 2455 ; see also Jones v. Mississippi, ––– U.S. ––––, 141 S. Ct. 1307, 1314, 209 L.Ed.2d 390 (2021) (same). ¶29 This is so for several reasons. First, juveniles' increased susceptibility to outside pressure, immature behavior, and impulsiveness means that "their irresponsible conduct is not as morally reprehensible as that of an adult." Roper, 543 U.S. at 570, 125 S.Ct. 1183 (quoting Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality opinion)). Both common sense and social science confirm that juveniles frequently demonstrate a "lack of maturity and an underdeveloped sense of responsibility" that "often result[s] in impetuous and ill-considered actions and decisions." Id. at 569, 125 S.Ct. 1183 (quoting Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ); see also Graham, 560 U.S. at 68, 130 S.Ct. 2011 ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence."). And compared to adults, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Roper, 543 U.S. at 569, 125 S.Ct. 1183. Given these characteristics, the transgressions of minors are viewed as less blameworthy than those of adults. See id. at 570, 125 S.Ct. 1183 ("From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult ...."). ¶30 Moreover, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." Id. at 571, 125 S.Ct. 1183. This is because "[juveniles] are less likely to take a possible punishment into consideration when making decisions." Graham , 560 U.S. at 72, 130 S.Ct. 2011. Deterrence-based justifications for punishment thus carry less weight in the context of offenses committed by juveniles.
¶31 Juvenile offenders are also more amenable to reform than adult offenders. "[T]he character of a juvenile is not as well formed as that of an adult," and their personalities are "more transitory, less fixed." Roper , 543 U.S. at 570, 125 S.Ct. 1183. Accordingly, their actions, even if heinous, "are less likely to be evidence of ‘irretrievably depraved character’ than are the actions of adults." Graham, 560 U.S. at 68, 130 S.Ct. 2011 (quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183 ); see also Roper, 543 U.S. at 570, 125 S.Ct. 1183 ("Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood." (quoting Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psych. 1009, 1014 (2003))). ¶32 Finally, the very fact of an offender's youth means that lifelong punishments are harsher in practice for juveniles than for adults. A juvenile often suffers the effects of such a sentence for "more years and a greater percentage of his life ... than an adult offender." Graham, 560 U.S. at 70, 130 S.Ct. 2011. A lifelong punishment, "when imposed on a teenager, as compared with an older person, is therefore ‘the same ... in name only.’ " Miller, 567 U.S. at 475, 132 S.Ct. 2455 (quoting Graham, 560 U.S. at 70, 130 S.Ct. 2011 ). ¶33 In light of these distinctive attributes of youth, mandatory punishments that are constitutional when applied to adult offenders can violate the Eighth Amendment when applied to juveniles. "Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." Id. at 476, 132 S.Ct. 2455. Mandatory penalties that fail to account for an offender's status as a juvenile "equate the failings of a minor with those of an adult," Roper, 543 U.S. at 570, 125 S.Ct. 1183, despite the fact that juveniles have "lesser culpability," id. at 571, 125 S.Ct. 1183. And in the context of lifelong sentences for juveniles, "mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." Miller, 567 U.S. at 478, 132 S.Ct. 2455.
C. Prior Constitutional Challenges to Sex Offender Registration Statutes
¶34 Litigants have brought a range of constitutional challenges to CSORA and other sex offender registration schemes over the past three decades, with mixed results. The Supreme Court first addressed such a challenge in Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). There, the Court was faced with the question of whether application of Alaska's sex offender registration scheme to adult offenders convicted before its passage constituted retroactive punishment in violation of the Ex Post Facto Clause, Article I, Section 10, Clause 1 of the U.S. Constitution. Smith , 538 U.S. at 89, 123 S.Ct. 1140. In a 6-3 decision, the Court determined that the registration scheme was nonpunitive and thus that its retroactive application did not violate the Ex Post Facto Clause. Id. at 105-06, 123 S.Ct. 1140. While the Court acknowledged that registration in some ways resembled early, shame-based punishments, it determined that publication of adult sex offender information was nonpunitive because it involved "dissemination of accurate information about a criminal record, most of which is already public." Id. at 98, 123 S.Ct. 1140. Further, the Court reasoned that because the length of registration was "reasonably related to the danger of recidivism," it was not disproportionate to the scheme's public safety purpose. Id. at 102, 123 S.Ct. 1140.
¶35 Though we have never addressed the issue, divisions of our court of appeals have consistently followed Smith's reasoning to hold that registration pursuant to CSORA does not constitute punishment for purposes of the Ex Post Facto Clause or the Eighth Amendment. See, e.g., People in Int. of C.M.D., 2018 COA 172, ¶¶ 14-28, 452 P.3d 133, 136-39 ; J.O., ¶¶ 17-30, 383 P.3d at 73-75 ; People v. Durapau, 280 P.3d 42, 48-49 (Colo. App. 2011). The U.S. Court of Appeals for the Tenth Circuit has likewise held that, under Smith , CSORA's provisions mandating registration do not constitute punishment for purposes of the Eighth Amendment. See Millard, 971 F.3d at 1181-84.11 And a number of other courts across the country have determined that similar sex offender registry schemes do not constitute punishment—albeit in the context of adult offenders. See, e.g., Vasquez v. Foxx, 895 F.3d 515, 520-22 (7th Cir. 2018) ; Doe v. Cuomo , 755 F.3d 105, 109-12 (2d Cir. 2014) ; Kammerer v. State, 322 P.3d 827, 830-39 (Wyo. 2014).
¶36 Litigants challenging juvenile sex offender registration schemes, however, have had more success. In relatively recent cases, three of our sister states have determined that mandatory sex offender registration requirements are unconstitutional when applied to juveniles. See In re C.P., 131 Ohio St.3d 513, 967 N.E.2d 729, 732 (2012) ; In re J.B., 630 Pa. 408, 107 A.3d 1, 2 (2014) ; State in Int. of C.K., 233 N.J. 44, 182 A.3d 917, 919 (2018) ; cf. In Int. of T.H., 913 N.W.2d 578, 586-97 (Iowa 2018) (determining that Iowa's juvenile sex offender registration scheme constitutes punishment for purposes of the Eighth Amendment but holding that it was not cruel and unusual punishment because the scheme sufficiently accounted for the unique circumstances of juvenile offenders); State v. Dull, 302 Kan. 32, 351 P.3d 641, 644 (2015) (concluding that "mandatory lifetime post[-]release supervision for juveniles who have committed and are later convicted of aggravated indecent liberties categorically constitutes cruel and unusual punishment").12 ¶37 In C.P. , the Ohio Supreme Court held that Ohio's sex offender registration scheme constituted cruel and unusual punishment under both the U.S. and Ohio Constitutions to the extent that it mandated lifetime sex offender registration for certain juvenile offenders. 967 N.E.2d at 732.13 Citing Graham , the court observed that juveniles subject to sex offender registration have "a reduced degree of moral culpability." Id. at 741. The court then explained that, given its public nature and attendant stigma, lifetime registration was a particularly severe penalty for juveniles, whose "potential will be squelched before it has a chance to show itself." Id. Finally, after examining penological justifications for registration of juveniles, the court concluded that mandatory lifetime registration for juveniles does not further any legitimate penological goals and, in fact, "do[es] violence to the rehabilitative goals of the juvenile court process." Id. at 744. The court thus held that, "for a juvenile offender who remains under the jurisdiction of the juvenile court, the Eighth Amendment forbids the automatic imposition of lifetime sex-offender registration and notification requirements." Id.
¶38 In J.B. , the Pennsylvania Supreme Court determined that mandatory lifetime sex offender registration for juveniles created an irrebuttable presumption that juveniles will reoffend, in violation of due process. See 107 A.3d at 19-20. After reviewing studies examining juvenile sex offender recidivism rates, the court concluded that this presumption was unsupported given that "the vast majority of juvenile offenders are unlikely to recidivate." Id. at 18. The court also found relevant the discussions in Roper , Graham , and Miller regarding the unique characteristics of juvenile offenders, noting that "these distinctions between adults and juveniles are particularly relevant in the area of sexual offenses, where many acts of delinquency involve immaturity, impulsivity, and sexual curiosity rather than hardened criminality ... [or] ‘irretrievable depravity.’ " Id. at 19 (quoting Miller, 567 U.S. at 471, 132 S.Ct. 2455 ). Because the court determined that the registration scheme at issue violated due process through use of an irrebuttable presumption, it declined to address whether it also constituted cruel and unusual punishment. Id. at 11 n.20, 12 n.21.
¶39 Following similar logic, the Supreme Court of New Jersey struck down portions of New Jersey's sex offender registration scheme on state constitutional due process grounds. C.K., 182 A.3d at 919. Though it had upheld more limited and reviewable registration requirements in the past, the court reasoned that the addition of a mandatory lifetime registration requirement changed the analysis. See id. at 927-30. Noting that psychological studies and empirical evidence suggested low rates of recidivism for juvenile sex offenders, see id. at 921-22, 934, the court ultimately determined that, because juveniles are "not likely to reoffend," the lifetime registration requirement for juvenile offenders "bears no rational relationship to a legitimate governmental objective," id. at 919.
¶40 These cases offer two observations that we find particularly relevant to the constitutionality of mandatory lifetime sex offender registration for juveniles. First, each court noted that sex offender registration and community notification schemes have evolved considerably over the past two decades, mandating registration for a broader group of offenders and increasing notification requirements and other burdens for those on the registry. See C.P., 967 N.E.2d at 738-39 ; J.B., 107 A.3d at 2-9 ; C.K., 182 A.3d at 927-30. The statutory schemes challenged in each of the three cases, much like the provisions of CSORA challenged by T.B., are materially different than the more limited registration requirements that the Supreme Court addressed in Smith . We thus cannot mechanically apply Smith's holding and reasoning without accounting for these differences. ¶41 Second, all three courts recognized that, while the holdings in Roper, Graham, and Miller were limited to whether certain punishments were categorically impermissible for juveniles, the comments made by the Supreme Court in those cases regarding the unique characteristics of juvenile offenders are applicable to a broad range of constitutional questions. See C.P., 967 N.E.2d at 740-46 ; J.B., 107 A.3d at 18-19 ; C.K., 182 A.3d at 931-32 ; see also J.D.B. v. North Carolina, 564 U.S. 261, 272-73, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (noting that the observations made in Roper and Graham are relevant in determining whether a child was in custody for purposes of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ). An offender's status as a juvenile is thus relevant not only to whether a punishment is cruel and unusual for purposes of the Eighth Amendment, but also to whether a statutory scheme is punitive for purposes of the Eighth Amendment.
¶42 With this legal framework to guide our analysis, we turn to the issue of first impression before this court: whether mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications constitutes cruel and unusual punishment in violation of the Eighth Amendment.
III. Analysis
¶43 We first address whether mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications constitutes punishment for purposes of the Eighth Amendment, ultimately concluding that it does. We next address whether that punishment is cruel and unusual, and similarly answer that question in the affirmative. Accordingly, we hold that CSORA violates the Eighth Amendment in imposing mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications.14 A. Mandatory Lifetime Sex Offender Registration for Offenders with Multiple Juvenile Adjudications Constitutes Punishment for Purposes of the Eighth Amendment ¶44 Under Mendoza-Martinez, courts apply a two-part intent-effects test to determine whether a statute is punitive. See 372 U.S. 144, 83 S.Ct. 554. First, the court must determine whether the legislature intended the statute to be punitive. Smith , 538 U.S. at 92, 123 S.Ct. 1140. "If the intention of the legislature was to impose punishment, that ends the inquiry." Id. If, however, the legislature intended the statute to be nonpunitive, the court must consider whether the statute is so punitive in effect as to override the legislature's intent. Id.
1. Intent ¶45 Throughout the statutory scheme, the General Assembly indicated that it did not intend for CSORA to be punitive. Indeed, section 16-22-112(1) explicitly states that CSORA is not intended and should not "be used to inflict retribution or additional punishment on any person." See also § 16-22-110(6)(a) (same). CSORA establishes a comprehensive registration and community notification program with two distinct aims: ensuring community protection15 and aiding law enforcement, including by facilitating communication between the CBI, local law enforcement, and other agencies.16 ¶46 Notably, a court may exempt a person from the registration requirement if, among other things, the offender was younger than eighteen at the time of the offense and the court "determines that the registration requirement ... would be unfairly punitive and that exempting the person ... would not pose a significant risk to the community." § 16-22-103(5)(a) (emphasis added). This language does not establish that the General Assembly intended CSORA to be punitive, but it does suggest that the General Assembly was aware that the registration scheme may, at times and as applied to certain juvenile offenders, be punitive in effect. That said, this single reference to punitiveness, standing alone, does not override the statutory scheme as a whole, which reflects a focus on community protection and aiding law enforcement. Accordingly, we cannot conclude that the General Assembly intended CSORA to be punitive. We therefore turn to whether, notwithstanding the legislature's nonpunitive intent, CSORA is punitive in effect.
2. Effects ¶47 To determine whether CSORA is punitive in effect, we consider a variety of factors, including (1) "[w]hether the sanction involves an affirmative disability or restraint," (2) "whether it has historically been regarded as a punishment," (3) "whether it comes into play only on a finding of scienter," (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence," (5) "whether the behavior to which it applies is already a crime," (6) "whether an alternative purpose to which it may rationally be connected is assignable for it," and (7) "whether it appears excessive in relation to the alternative purpose assigned." Mendoza-Martinez, 372 U.S. at 168-69, 83 S.Ct. 554.
¶48 One factor clearly weighs against finding CSORA to be punitive in effect: A finding of scienter is not required before imposing lifetime registration upon a juvenile. Instead, lifetime registration is required for any offender who has multiple juvenile adjudications. See § 16-22-103(4). But the remaining factors lead us to conclude that mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications constitutes punishment for purposes of the Eighth Amendment.
¶49 First, mandatory lifetime sex offender registration for juveniles involves an affirmative disability or restraint. Under CSORA, sex offenders are required, through annual, in-person registration, to disclose extensive personal information. See §§ 16-22-108(1)(a)(II), (1)(b), 16-22-109(1). They must also update their information within five days of certain life events or changes, including any change in address. § 16-22-108(1)(c), (3). Sex offenders must bear the costs of annual registration, including the cost of an updated photograph and a set of fingerprints, § 16-22-108(6), as well as a registration fee, which may be imposed at each local law enforcement agency's discretion, § 16-22-108(7)(a). Failure to comply with any of the applicable registration requirements can subject an offender to criminal sanctions. § 16-22-103(6) ; § 18-3-412.5, C.R.S. (2020). These registration requirements and recurring costs become all the more onerous when applied to a juvenile offender whose youth typically means that he will be subject to such requirements for "more years and a greater percentage of his life ... than an adult offender." Graham, 560 U.S. at 70, 130 S.Ct. 2011.
¶50 Additionally, though Colorado imposes no statewide residency restrictions on sex offenders, individual municipalities may impose such restrictions. See C.M.D., ¶ 23, 452 P.3d at 138 ("[R]egistration does not limit where offenders may live or where they may work, although local ordinances may do so.").17 And other states do impose statewide residency restrictions on sex offenders,18 which could apply to a sex offender who moves from Colorado to another state. See § 16-22-105(1), C.R.S. (2020) (explaining that a registrant "has a duty to register with local law enforcement agencies in any state or other jurisdiction to which the person may move"). These restrictions are more than a mere inconvenience—in some instances they may functionally prohibit a registrant from living in an entire municipality. See Ryals v. City of Englewood, 2016 CO 8, ¶ 5, 364 P.3d 900, 904 (noting that a prior version of Englewood's sex offender residency restrictions "ma[de] 99% of the city off limits to qualifying sex offenders").
¶51 A person's status as a sex offender also may affect that person in his pursuit of gainful employment. For example, an employer who conducts a criminal history check can discover whether the prospective employee is on the sex offender registry. § 16-22-110(6)(b). CSORA thus provides an employer with access to a person's juvenile criminal history—information that otherwise would not be publicly available. See generally § 19-1-304(1), C.R.S. (2020) (providing for only limited disclosure of court and other records in juvenile delinquency proceedings); Chief Justice Directive 05-01, Public Access to Court Records, § 4.60(b) (amended Oct. 18, 2016) (providing that court records in juvenile delinquency cases are not accessible to the public absent court order). Moreover, several Colorado municipalities restrict the availability of certain business licenses based on whether the applicant is on the sex offender registry.19 ¶52 Second, sex offender registration and community notification programs resemble traditional forms of punishment, such as public shaming and humiliation. "Widespread dissemination of offenders' names, photographs, addresses, and criminal history serves not only to inform the public but also to humiliate and ostracize the" offenders. Smith , 538 U.S. at 109, 123 S.Ct. 1140 (Souter, J., concurring in the judgment). CSORA's community notification provisions enable the use of "registry information to harass, victimize, or discriminate against sex offenders," who may isolate themselves from the rest of society to avoid such consequences. Halbrook, supra at 18. In an era of social media, these realities are especially striking for juvenile offenders who are branded with the label of sex offender before their adult lives have even begun. Cf. Doe v. State, 167 N.H. 382, 111 A.3d 1077, 1097 (2015) ("[I]n many ways, the internet is our town square. Placing offenders' pictures and information online serves to notify the community, but also holds them out for others to shame or shun."). True, the U.S. Supreme Court concluded in Smith that "the dissemination of accurate information about a criminal record, most of which is already public," is not punishment. 538 U.S. at 98, 123 S.Ct. 1140. But that case involved adult offenders, whose convictions are "already a matter of public record." Id. at 101, 123 S.Ct. 1140. Not so for juvenile offenders. The dissemination of information about juvenile sex offenders thus appears more punitive in light of the presumptive confidentiality of most other juvenile adjudications.
¶53 Third, mandatory lifetime sex offender registration for juveniles promotes the traditional aims of punishment—retribution and deterrence. Under CSORA, offenders with multiple juvenile adjudications are compelled to register for the remainder of their natural lives, regardless of individual risk to reoffend, and even when they no longer pose a threat to the community. As a result, the registration requirement appears to be retributive in nature, punishing a juvenile for his past conduct without regard to the threat—or lack thereof— that the juvenile currently poses. See id. at 109, 123 S.Ct. 1140 (Souter, J., concurring in the judgment) ("The fact that [Alaska's sex offender registration statute] uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on ...."); see also, e.g., Doe, 111 A.3d at 1098 (finding that a sex offender registration statute "promotes the traditional aims of punishment" because it "requires offenders to register based only upon their past action, and not on any individualized assessment of current risk or level of dangerousness"); Commonwealth v. Baker, 295 S.W.3d 437, 444 (Ky. 2009) ("When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones."). Moreover, though not dispositive, the CBI specifically identifies "[d]eterrence of sex offenders for committing similar crimes" as one of the goals of registration. See Registration, Colo. Bureau of Investigation, https://apps.colorado.gov/apps/dps/sor/information.jsf, [https://perma.cc/R6RW-KVZH].
¶54 Fourth, the behavior to which CSORA applies is already a crime. Indeed, the People acknowledge as much in their briefing, noting that "the underlying conduct that triggers the registration requirement is a crime; [T.B.] would not have been subject to CSORA's requirements but for the commission of his multiple sex offenses."
¶55 Finally, and perhaps most importantly, mandatory lifetime sex offender registration for juveniles does not bear a rational connection to, and is excessive in relation to, CSORA's nonpunitive purposes of protecting the community and aiding law enforcement. As the U.S. Supreme Court has frequently observed, juvenile offenders generally are more amenable to rehabilitation and less likely to reoffend than their adult counterparts. See Graham , 560 U.S. at 68, 130 S.Ct. 2011 ("Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of ‘irretrievably depraved character’ than are the actions of adults." (quoting Roper , 543 U.S. at 570, 125 S.Ct. 1183 )); see also Miller , 567 U.S. at 479, 132 S.Ct. 2455 (noting that minors have a "heightened capacity for change"). Given this capacity for reform, juvenile offenders are less likely to pose an ongoing threat to public safety after completion of their treatment and probation.
¶56 These general observations are borne out in empirical studies examining recidivism among juvenile sex offenders. A meta-analysis of over thirty studies conducted over the past twenty years found that the recidivism rate for juvenile sex offenders is less than three percent. See Michael F. Caldwell, Quantifying the Decline in Juvenile Sexual Recidivism Rates, 22 Psychol. Pub. Pol'y & L. 414, 419 (2016) ; see also Halbrook, supra at 13-15 (collecting studies). And among those juvenile offenders who did reoffend, the vast majority did so within three years of their first offense. See Caldwell, supra at 419. Mandatory lifetime registration for juveniles thus lacks a rational connection to, and is excessive in relation to, CSORA's nonpunitive purposes of protecting the community and aiding law enforcement in light of the low baseline recidivism rate for juvenile offenders and the narrow window during which juvenile offenders are likely to reoffend at all.
¶57 Moreover, a number of studies indicate that registration requirements have no statistically significant effect on reducing recidivism rates among offenders. See Molly J. Walker Wilson, The Expansion of Criminal Registries and the Illusion of Control, 73 La. L. Rev. 509, 523, 523 n.93 (2013) (collecting studies). Indeed, in some instances, "registries may actually increase crime by alienating juvenile registrants from social supports and institutions (including education, housing, employment, and family) that reduce the risk of delinquent behaviors." Halbrook, supra at 16.
¶58 In sum, mandatory lifetime sex offender registration for juveniles imposes affirmative disabilities and restraints; resembles traditional shame-based punishments; promotes deterrence and retribution; applies only to criminal offenses; and does not bear a rational relationship to—and is excessive in light of—its nonpunitive purposes. Because these punitive effects outweigh the General Assembly's nonpunitive intent, we conclude that mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications constitutes punishment for purposes of the Eighth Amendment.20 We turn now to whether such punishment is cruel and unusual.
B. Mandatory Lifetime Sex Offender Registration for Offenders with Multiple Juvenile Adjudications Violates the Eighth Amendment's Prohibition on Cruel and Unusual Punishment ¶59 To decide whether mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications is impermissibly cruel and unusual, we first look to " ‘objective indicia of society's standards, as expressed in legislative enactments and state practice’ to determine whether there is a national consensus against the sentencing practice." Graham , 560 U.S. at 61, 130 S.Ct. 2011 (quoting Roper , 543 U.S. at 563, 125 S.Ct. 1183 ). Next, we must determine, "in the exercise of our own independent judgment," whether mandatory lifetime sex offender registration "is a disproportionate punishment for juveniles." Roper, 543 U.S. at 564, 125 S.Ct. 1183.
1. Objective Indicia of Societal Consensus ¶60 Courts look to objective indicia of societal consensus for evidence of the "evolving standards of decency" that animate the Eighth Amendment. Atkins, 536 U.S. at 312, 122 S.Ct. 2242 (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)). The "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." Graham, 560 U.S. at 62, 130 S.Ct. 2011 (quoting Atkins, 536 U.S. at 312, 122 S.Ct. 2242 ). Thus, in Roper , the Supreme Court reasoned that the abolition of the juvenile death penalty by thirty states provided "sufficient evidence" of a societal consensus against the sentence. 543 U.S. at 564-67, 125 S.Ct. 1183.
¶61 Fewer than a third of our sister states have laws providing for mandatory lifetime sex offender registration of juveniles.21 Eight states and the District of Columbia do not subject juveniles to registration at all unless they are tried and convicted as adults.22 Another fifteen states, along with SORNA, do not require registration for offenses committed by juveniles under the age of fourteen.23 Other states allow courts discretion in determining whether to require registration for juveniles who have committed all but the most serious offenses.24 And of the states that do permit registration of juveniles, fourteen provide for automatic termination of registration within a set number of years,25 while ten allow juvenile offenders to petition to remove their names from the registry after an allotted time.26 ¶62 While our sister states have adopted a wide variety of approaches to sex offender registration, a substantial majority of them decline to impose mandatory lifetime sex offender registration on juvenile offenders like T.B. CSORA's mandatory lifetime registration requirement for juveniles, therefore, is "truly unusual," and our review of other states' laws reflects a national consensus against such a punishment. Atkins, 536 U.S. at 316, 122 S.Ct. 2242 ; cf. C.P., 967 N.E.2d at 739 ("The assumption that a national consensus favored publication of juvenile sex offenders' personal information [has] collapsed.").
2. This Court's Independent Exercise of Judgment ¶63 "Community consensus, while ‘entitled to great weight,’ is not itself determinative of whether a punishment is cruel and unusual." Graham, 560 U.S. at 67, 130 S.Ct. 2011 (quoting Kennedy, 554 U.S. at 434, 128 S.Ct. 2641 ). Objective indicia of societal consensus inform our analysis, but "the Constitution contemplates that in the end our own judgment will be brought to bear" on whether mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications is permissible under the Eighth Amendment. Atkins , 536 U.S. at 312, 122 S.Ct. 2242 (quoting Coker v. Georgia , 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion)). In making this judgment, we must consider whether "the severity of the punishment in question" is disproportionate to "the culpability of the offenders at issue in light of their crimes and characteristics." Graham , 560 U.S. at 67, 130 S.Ct. 2011. We also assess "whether the challenged sentencing practice serves legitimate penological goals." Id.
¶64 After considering each of these factors, we conclude that CSORA violates the Eighth Amendment's prohibition on cruel and unusual punishments in requiring mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications.
¶65 While mandatory lifetime sex offender registration for juveniles is not as drastic a punishment as the sentences at issue in Roper, Graham, and Miller , it is a severe punishment nonetheless. Sex offender registries broadcast juvenile offenders' misdeeds to the world, attaching a stigma that will last their entire lives. These juveniles are, "in effect, branded as irredeemable—at a point when their lives have barely begun and before their personalities are fully formed." C.K., 182 A.3d at 934 ; see also C.P., 967 N.E.2d at 741-42 ("A juvenile ... who is subject to sex-offender notification will have his entire life evaluated through the prism of his juvenile adjudication."). ¶66 The effects of publication on the sex offender registry are often disastrous for juvenile offenders. Although CSORA states that it is not intended to promote vigilante justice,27 one national survey of juvenile registrants suggests that over half have experienced violence or threats of violence against themselves or family members that they directly attribute to their registration. See Nicole Pittman & Alison Parker, Human Rights Watch, Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the U.S. 56 (2013), https://www.hrw.org/sites/default/files/reports/us0513_ForUpload_1.pdf [https://perma.cc/9ZLG-SAXA]. For many others, the stigmatization and challenges brought about by lifetime registration lead to self-harm; nearly one in five juvenile registrants surveyed had attempted suicide. Id. at 51. And beyond those more drastic consequences, juvenile registrants face effectively permanent, lifelong barriers to obtaining basic housing, education, and employment. See id. at 64-75.28 ¶67 The severe consequences of registration and publication of a juvenile's sex offender status are compounded by the length and finality of the punishment. A mandatory lifetime registration requirement serves as a regular "reminder to [the juvenile] and the world that he cannot escape the mistakes of his youth." C.P., 967 N.E.2d at 742. "While not a harsh penalty to a career criminal used to serving time in a penitentiary," lifetime sex offender registration "means everything to a juvenile." Id. The mandatory lifetime registration requirement, in effect, "means denial of hope; it means that good behavior and character improvement are immaterial." Graham, 560 U.S. at 70, 130 S.Ct. 2011 (quoting Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 944 (1989) ).
¶68 The magnitude of punishment inflicted through mandatory lifetime sex offender registration is disproportionate to the comparatively diminished culpability of juvenile offenders. As the Supreme Court has repeatedly emphasized, juveniles have lesser culpability and greater capacity for reform than adult offenders. See Roper, 543 U.S. at 570-71, 125 S.Ct. 1183 ; Graham, 560 U.S. at 72-73, 130 S.Ct. 2011 ; Miller, 567 U.S. at 471, 132 S.Ct. 2455. Juveniles frequently exhibit an underdeveloped sense of responsibility, a greater susceptibility to outside pressures, and more transitory personality traits, all of which suggest that, over time, "a greater possibility exists that a minor's character deficiencies will be reformed." Roper, 543 U.S. at 570, 125 S.Ct. 1183. Mandatory lifetime sex offender registration ignores these characteristics and uniformly deems certain classes of juvenile offenders to be "incorrigible" on the basis of actions taken before reaching the age of maturity—a "questionable" judgment that "improperly denies the juvenile offender a chance to demonstrate growth and maturity." Graham, 560 U.S. at 73, 130 S.Ct. 2011.
¶69 Mandatory lifetime sex offender registration for juvenile offenders also fails to serve any legitimate penological goals. Indeed, by foreclosing any chance of redemption, mandatory lifetime registration stands in direct opposition to the goals of the juvenile justice system, which is "primarily designed to provide guidance, rehabilitation, and restoration for the juvenile." Bostelman v. People, 162 P.3d 686, 691 (Colo. 2007) ; see also S.G.W. v. People, 752 P.2d 86, 91 (Colo. 1988) ("[A] child who is adjudicated a delinquent under the Colorado Children's Code stands before the juvenile court not as a convicted criminal but as a child in need of reformation.").
¶70 The traditional goals of the adult justice system—retribution, deterrence, incapacitation, and rehabilitation, see Graham , 560 U.S. at 71, 130 S.Ct. 2011 —are similarly ill-served by mandatory lifetime sex offender registration for juveniles. As noted, CSORA is not intended to "inflict retribution or additional punishment" on registrants. § 16-22-112(1). But to the extent that registration does inflict retribution, a retributive or punitive rationale does not support imposing such a severe penalty on juvenile offenders; because the " ‘heart of the retribution rationale’ relates to an offender's blameworthiness, ‘the case for retribution is not as strong with a minor as with an adult.’ " See Miller, 567 U.S. at 472, 132 S.Ct. 2455 (quoting Graham, 560 U.S. at 71, 130 S.Ct. 2011 ).
¶71 Mandatory lifetime registration for juvenile offenders also fails to achieve deterrence. Juveniles "are less likely to take a possible punishment into consideration when making decisions." Graham, 560 U.S. at 72, 130 S.Ct. 2011. Indeed, the "likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight" to the possibility of lifetime sex offender registration "is so remote as to be virtually nonexistent." Roper, 543 U.S. at 572, 125 S.Ct. 1183 (quoting Thompson, 487 U.S. at 837, 108 S.Ct. 2687 ). This is particularly true of sex offender registration, given that "the significance of the particular punishment and its effects are less likely to be understood by the juvenile than the threat of time in a jail cell. Juveniles are less likely to appreciate the concept of loss of future reputation." C.P., 967 N.E.2d at 743.
¶72 Finally, given its non-carceral nature, sex offender registration cannot be justified on grounds of incapacitation. But to the extent that registration is designed to serve related public safety goals, those goals do not justify mandatory lifetime registration for juvenile offenders. As noted above, studies have consistently demonstrated that juvenile offenders are unlikely to reoffend, particularly after the first few years following their offense. A uniform determination that certain juvenile offenders are "incorrigible" is thus unsubstantiated. See Graham, 560 U.S. at 73, 130 S.Ct. 2011. Even if a juvenile offender is adjudged to be an ongoing public threat long after that juvenile's offense, mandatory lifetime registration would still be "disproportionate because that judgment was made at the outset." Id.
¶73 For all these reasons, and in light of the objective indicia of societal consensus discussed above, we now hold that mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications constitutes cruel and unusual punishment in violation of the Eighth Amendment.
IV. Conclusion
¶74 For the foregoing reasons, we hold that mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications constitutes punishment and is cruel and unusual. To be clear: We express no opinion on the legislature's ability to mandate lifetime sex offender registration for adult offenders. Nor do we opine on any other scheme requiring juvenile offenders to register as sex offenders. Today we simply hold that the legislature cannot, under the Eighth Amendment, mandate lifetime sex offender registration for offenders with multiple juvenile adjudications without providing a mechanism for individualized assessments or an opportunity to deregister upon a showing of rehabilitation. We thus affirm in part and reverse in part the judgment of the court of appeals, and remand with instructions to order a new hearing on T.B.'s petition to deregister.
CHIEF JUSTICE BOATRIGHT dissents.
CHIEF JUSTICE BOATRIGHT, dissenting.
¶1 T.B. took advantage of the treatment available to him, and he made enormous strides on his path to rehabilitation. I don't discount T.B.'s hard work during treatment, which resulted in high praise from his probation officer. Quite candidly, I believe it is unfair that the Colorado Sex Offender Registration Act ("CSORA") requires lifetime sex offender registration without an opportunity to deregister for people like T.B., who committed multiple offenses when they were juveniles. But the unfairness of CSORA's registration requirement as it applies to T.B. does not render the requirement, on its face, punishment.
¶2 CSORA is a complex statute, imposing various registration requirements on those convicted of offenses involving unlawful sexual behavior. The questions we face today, however, are straightforward: (1) Does lifetime sex offender registration constitute punishment? (2) If so, is that punishment cruel and unusual? Because I cannot answer the first question affirmatively, I cannot join my colleagues in the majority. In my view, registration is not punishment, and therefore, registration cannot constitute cruel and unusual punishment. In addition, T.B. has not met the high standard of establishing that the effects of the registration requirement are punitive by the "clearest proof." And while the majority raises valid concerns about the fairness of sex offender registration as it applies to juveniles, those concerns are for the General Assembly to address.1 Accordingly, I respectfully dissent.
I. Registration Is Not Punishment
¶3 The U.S. Supreme Court has provided a comprehensive test for determining whether a statute is punitive. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). First, if the legislature intends for a statute to be punitive, the statute should be considered punitive, and a court does not conduct any further inquiry. Smith v. Doe, 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). But if the legislature intended the statute to be nonpunitive, a court must consider seven factors to determine whether the statute's punitive effect overrides legislative intent. Id. at 92, 97, 123 S.Ct. 1140. We consider those seven factors "in relation to the statute on its face." Mendoza-Martinez, 372 U.S. at 169, 83 S.Ct. 554.
¶4 Because courts " ‘ordinarily defer to the legislature's stated intent,’ ‘ "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.’ " Smith, 538 U.S. at 92, 123 S.Ct. 1140 (citation omitted) (first quoting Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ; and then quoting Hudson v. United States, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) ). Thus, where the legislature, as here, expresses a nonpunitive intent, it is the registrant's burden to establish by "the clearest proof" that the effect of the statute is so punitive as to negate the legislature's intent.2 Hendricks, 521 U.S. at 361, 117 S.Ct. 2072 (quoting United States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980).
¶5 Applying this test, divisions of our court of appeals have consistently concluded that CSORA is nonpunitive. See, e.g., People in Int. of J.O., 2015 COA 119, ¶ 30, 383 P.3d 69, 75 ("[W]e decline to depart from Colorado cases holding that sex offender registration under section 16-22-103 —even as applied to juveniles—does not constitute punishment."); People in Int. of C.M.D., 2018 COA 172, ¶ 17, 452 P.3d 133, 137 ("Consistent with the legislature's stated intent, divisions of this court have uniformly held that sex offender registration is not punishment.") (collecting cases); People v. Durapau, 280 P.3d 42, 49 (Colo. App. 2011) ("[R]egistration is not punitive, but rather aids law enforcement in investigating future crimes and promotes public safety."); People in Int. of J.T., 13 P.3d 321, 323 (Colo. App. 2000) ("The statutory duty to register as a sex offender is not a criminal punishment.").
¶6 And significantly, the U.S. Supreme Court has come to the same conclusion: Registration does not equal punishment. Smith, 538 U.S. at 105, 123 S.Ct. 1140 ("Our examination of the [Alaska Sex Offender Registration] Act's effects leads to the determination that respondents cannot show, much less by the clearest proof, that the effects of the law negate Alaska's intention to establish a civil regulatory scheme. The Act is nonpunitive ....").
¶7 Federal circuit courts have concluded the same with regard to various sex offender registration statutes. See, e.g., Millard v. Camper, 971 F.3d 1174, 1184 (10th Cir. 2020) ("[W]e conclude that the Appellees have not presented the clearest proof of punitive effect, and that therefore CSORA is not punitive as applied to Appellees."); United States v. Parks, 698 F.3d 1, 5-6 (1st Cir. 2012) (joining "every circuit to consider the issue" by concluding that the federal Sex Offender Registration and Notification Act ("SORNA") registration requirements are not so punitive in effect as to constitute punishment); Doe v. Pataki , 120 F.3d 1263, 1285 (2d Cir. 1997) ("Because the plaintiffs have not demonstrated by the clearest proof that the registration provisions of the [New York Sex Offender Registration Act] are punitive in form and effect, we hold that these provisions of the Act do not constitute punishment for purposes of the Ex Post Facto Clause[.]"); United States v. Young, 585 F.3d 199, 205 (5th Cir. 2009) ("[The defendant] must present the ‘clearest proof’ that either the purpose or the effect of the regulation is in fact so punitive as to negate its civil intent. This he cannot do."); Vasquez v. Foxx, 895 F.3d 515, 520 (7th Cir. 2018) ("SORNA's registration regime for sex offenders is not penal in nature."); Doe v. Miller, 405 F.3d 700, 723 (8th Cir. 2005) ("[W]e conclude that the [Appellees] have not established the ‘clearest proof’ that Iowa's choice [in sex offender residency restrictions] is excessive in relation to its legitimate regulatory purpose, such that a statute designed to be nonpunitive and regulatory should be considered retroactive criminal punishment."); Hatton v. Bonner, 356 F.3d 955, 967 (9th Cir. 2004) ("When we examine the seven Mendoza-Martinez factors, Petitioner cannot demonstrate through ‘the clearest proof’ that [California's sex-offender registration statute] is ‘so punitive either in purpose or effect as to negate [the State's] intention to deem it civil.’ " (second alteration in original) (quoting Smith, 538 U.S. at 92, 123 S.Ct. 1140 )).
¶8 Same with other state courts. See, e.g., In Int. of Justin B., 419 S.C. 575, 799 S.E.2d 675, 681 (2017) ("The requirement that adults and juveniles who commit criminal sexual conduct must register as a sex offender and wear an electronic monitor is not a punitive measure, and the requirement bears a rational relationship to the Legislature's purpose ...." (emphasis added)); State v. Boche, 294 Neb. 912, 885 N.W.2d 523, 532 (2016) ("Because we conclude the lifetime registration requirements imposed on [the juvenile] are not punishment, his argument that these registration requirements amount to cruel and unusual punishment must necessarily fail."); In re J.W., 204 Ill.2d 50, 272 Ill.Dec. 561, 787 N.E.2d 747, 762 (2003) ("Because we hold that the [sex offender] registration requirement does not constitute punishment, [the juvenile's] double jeopardy argument likewise must fail."); People in Int. of Birkett v. Konetski , 233 Ill.2d 185, 330 Ill.Dec. 761, 909 N.E.2d 783, 799 (2009) (accounting for the Supreme Court's decision in Roper v. Simmons, 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), but still adhering to precedent "holding that the [Illinois Sex Offender Registration] Act's registration requirement as applied to juveniles does not amount to a punishment"); Helman v. State , 784 A.2d 1058, 1078 (Del. 2001) (holding that Delaware's sex offender notification and registration requirement, as applied to juveniles, "does not constitute punishment"); Kammerer v. State, 322 P.3d 827, 839 (Wyo. 2014) (concluding that Wyoming's Sex Offender Registration Act "imposes only a regulatory burden on convicted sex offenders" and therefore does not constitute punishment); In re J.C., 13 Cal.App.5th 1201, 221 Cal. Rptr. 3d 579, 593 (2017) ("Because [the juvenile] has failed to establish that juvenile sex offender registration is punishment, his claim that registration is cruel and unusual punishment must fail."); In re Welfare of J.R.Z., 648 N.W.2d 241, 249 (Minn. Ct. App. 2002) (concluding that the lifetime sex offender registration requirement, which applied to juveniles, "is not punitive because it serves the regulatory purpose of assisting police investigations" but inviting the legislature to review the requirement (quoting In re Welfare of C.D.N., 559 N.W.2d 431, 433 (Minn. Ct. App. 1997) )).
¶9 Thus, federal and state courts alike have repeatedly recognized that overriding the legislature's intent is a heavy burden, see Hendricks, 521 U.S. at 361, 117 S.Ct. 2072, and that the effect of sex offender registration statutes is not so punitive as to meet that burden. See supra ¶¶ 5-8.3 But today, the majority turns its back on decades of precedent from other state courts, federal courts, and even the U.S. Supreme Court. I cannot join them in putting Colorado so far out of the mainstream by finding that sex offender registration is punishment, let alone cruel and unusual punishment. Rather, I would follow the reasoning of the overwhelming number of jurisdictions and conclude that CSORA's registration requirement is not so punitive in effect as to override legislative intent and render the registration requirement punishment.
¶10 The framework for determining whether something is punishment is well established by the Mendoza-Martinez seven-factor test. While I agree with the majority on the applicable test, I strongly disagree with the majority's application of the factors here. Taking each Mendoza-Martinez factor in turn, I reach the opposite conclusion from the majority.4 A. CSORA Does Not Impose an Affirmative Disability or Restraint
¶11 The majority concludes that CSORA imposes an affirmative disability or restraint on juvenile registrants, thus favoring its determination that CSORA is punitive. Maj. op. ¶¶ 49-51. Although there is no precise definition of "affirmative disability or restraint," imprisonment has been recognized as "the paradigmatic affirmative disability or restraint." Smith, 538 U.S. at 100, 123 S.Ct. 1140. Of course, that paradigm has shifted in some ways, but I don't view the registration requirements here as clearly rising to the level of affirmative disabilities or restraints. True, registrants must provide personal information through the registration process and update such information as it changes. Maj. op. ¶ 49 (citing §§ 16-22-108(1)(a)(II), (b), (c), - 108(3), - 109(1), C.R.S. (2020) ).
¶12 But CSORA does not prohibit registrants from doing anything; it doesn't even require that registrants seek permission before making significant changes (e.g., moving residences, changing employment, or enrolling in a postsecondary education institution). It only requires that the registrants report such changes as they occur. See C.M.D., ¶ 23, 452 P.3d at 138 ("Unlike prison, probation, or parole, registration does not limit where offenders may live or where they may work, although local ordinances may do so."). These reporting requirements are, without a doubt, burdensome and inconvenient to registrants, but they are not so onerous as to transform the registration requirement into punishment. That, in my view, requires more than burdens and inconveniences. Smith, 538 U.S. at 101-02, 123 S.Ct. 1140 (concluding that Alaska's Sex Offender Registration Act did not impose affirmative restraints because the statute required that offenders report changes to employment, appearance, or residence, but did not prevent offenders from making such changes); Shaw v. Patton, 823 F.3d 556, 568-69 (10th Cir. 2016) (concluding that "in-person reporting requirements are burdensome; but under our precedents, the burden is not so harsh that it constitutes punishment," and collecting cases to acknowledge that other circuits ordinarily consider in-person reporting requirements nonpunitive).
¶13 The division below recognized as much. That is, even though the division departed from a long line of cases by concluding that T.B.'s registration requirement constituted punishment, it nonetheless recognized that CSORA did not impose an affirmative disability or restraint. People in Int. of T.B., 2019 COA 89, ¶ 32, ––– P.3d –––– ("[T]he registration requirement involves no affirmative disability or restraint, at least not directly."). But the majority disagrees.
¶14 The majority concludes that CSORA imposes an affirmative disability or restraint because individual municipalities may impose residency restrictions and employers may discover a juvenile's criminal history when evaluating the juvenile as a job candidate.5 Maj. op. ¶¶ 50-51. To be sure, these are undesirable consequences. However, these collateral impacts are not a direct function of CSORA, and even if they were, they do not rise to the level that constitutes affirmative disabilities or restraints. Smith, 538 U.S. at 100, 123 S.Ct. 1140 ("If the disability or restraint is minor and indirect, its effects are unlikely to be punitive.").
¶15 Instead, following the reasoning of the U.S. Supreme Court and the Tenth Circuit, I would find that these collateral consequences of registration, while burdensome, do not impose an affirmative disability or restraint such that they are punitive. See id. ("The Act does not restrain activities sex offenders may pursue but leaves them free to change jobs or residences."); Millard, 971 F.3d at 1183 (concluding that CSORA does not impose an affirmative disability or restraint because the reporting requirements are less harsh than residency restrictions or occupational debarment, which have been recognized as nonpunitive restraints); Shaw , 823 F.3d at 570 ("[T]he additional burdens imposed by ... residency restrictions do not amount to a disability or restraint that has a punitive effect."); see also Doe v. Miller , 405 F.3d at 721 (concluding that a residency restriction imposed an element of affirmative disability or restraint, but not necessarily one that was punitive). While I recognize that there are challenges associated with residency due to municipal ordinances, these challenges are not punitive disabilities or restraints stemming from CSORA. Rather, they are challenges that stem from the fact that the offender committed delinquent acts of a sexual nature.
B. Registration Has Not Been Historically Regarded as Punishment
¶16 The majority suggests that registration resembles historical, shame-based punishments because widespread dissemination of registrants' information serves to humiliate them and enables "the use of ‘registry information to harass, victimize, or discriminate against sex offenders.’ " Maj. op. ¶ 52 (quoting Amy E. Halbrook, Juvenile Pariahs, 65 Hastings L.J. 1, 18 (2013) ). I don't doubt that a registrant may feel shamed by having their name listed on the sex offender registry. And of course, sharing information about criminal activity has "always held the potential for substantial negative consequences for those involved in that activity." Femedeer v. Haun, 227 F.3d 1244, 1251 (10th Cir. 2000) (quoting E.B. v. Verniero, 119 F.3d 1077, 1099 (3d Cir. 1997) ). But unlike traditional shame-based punishments, the registration requirement itself does not exist to shame offenders. Instead, the statute's purpose is to collect accurate information in the interest of public safety. In other words, CSORA does not put juvenile offenders on display to shame them; instead, CSORA provides "accurate information about a criminal record." Millard, 971 F.3d at 1182 (quoting Smith, 538 U.S. at 98, 123 S.Ct. 1140 ). And unlike for adult registrants, that information is not automatically made public for juveniles.6 The U.S. Supreme Court has addressed this very subject. ¶17 In Smith , the Court distinguished sex offender registries from traditional shame-based punishment, reasoning that "[i]n contrast to the colonial shaming punishments ... the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme." 538 U.S. at 99, 123 S.Ct. 1140.7 The Court further recognized that this kind of registration scheme serves a "legitimate governmental objective" that does not amount to punishment, let alone historically recognized punishment. Id. at 98, 123 S.Ct. 1140 ("Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment.").
¶18 Finally, I am not convinced that the dissemination of information about juvenile sex offenders takes on a more punitive effect in light of the presumptive confidentiality of most other juvenile adjudications. Cf. Maj. op. ¶ 52. In examining this factor of the Mendoza-Martinez test, we look to "whether CSORA's registration requirements are ‘regarded in our history and traditions as a punishment.’ " Millard, 971 F.3d at 1182 (quoting Smith, 538 U.S. at 97, 123 S.Ct. 1140 ). A survey of case law overwhelmingly demonstrates that registration has not historically been considered punishment, nor is it commonly regarded as such today. See supra ¶¶ 5-8. Under this lens, I don't believe that the age of an offender can singlehandedly transform something that has historically been regarded as non-punishment into punishment.
C. Registration Does Not Promote the Traditional Aims of Punishment: Retribution and Deterrence
¶19 The majority asserts that, because offenders with multiple juvenile adjudications must register regardless of individual risk to reoffend, CSORA is retributive and therefore promotes the traditional aims of punishment. Maj. op. ¶ 53. In my view, the majority departs from U.S. Supreme Court precedent without good cause.
¶20 Retribution is the notion that a criminal sentence must be "directly related to the personal culpability of the criminal offender." Graham v. Florida, 560 U.S. 48, 71, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (quoting Tison v. Arizona, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) ). Retributive considerations come into play at sentencing when a court imposes incarceration, fines, or probation with specific conditions. Again, the Supreme Court has directly addressed this issue in Smith , where the Court concluded that sex offender registration requirements were not retributive even though the length of the registration requirement was "measured by the extent of the wrongdoing, not by the extent of the risk posed." Smith, 538 U.S. at 102, 123 S.Ct. 1140 (quoting Doe I v. Otte, 259 F.3d 979, 990 (9th Cir. 2001) ); accord Millard, 971 F.3d at 1183 ("[T]he Smith Court also rejected the argument that tying the length of the reporting requirement to the nature of the offense, rather than individual risk , renders the registration obligation retributive." (emphasis added)). The Court further noted that states are not precluded from making "reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." Smith , 538 U.S. at 103, 123 S.Ct. 1140.
¶21 Here, the legislature made a choice to limit mandatory lifetime registration to only those juveniles who have been adjudicated delinquent more than once. See § 16-22-103(4), C.R.S. (2020). By carving out a specific category of juvenile offenders for lifetime registration, CSORA imposes registration requirements on those individuals regardless of their specific risk to reoffend. Our General Assembly chose to increase the length of the registration requirements for juveniles with multiple adjudications based on the extent of the wrongdoing. The legislature has the authority to make these kinds of categorical judgments so long as they are reasonably related to the statute's nonpunitive purposes and consistent with its regulatory objectives. See Smith, 538 U.S. at 102, 123 S.Ct. 1140. The General Assembly's conclusion that a juvenile who commits multiple sexual offenses presents a risk to the community is not unreasonable. Therefore, I cannot conclude that the registration requirements for juveniles twice adjudicated delinquent are so unreasonable and inconsistent with the statute's regulatory objectives that it has a retributive purpose.
¶22 The majority also notes that the deterrent purpose of the statute favors a finding that the statute is punitive. Maj. op. ¶ 53. However, deterrence is a component of many regulatory schemes, and therefore, the presence of a deterrent purpose alone does not render a regulatory scheme punishment. Smith, 538 U.S. at 102, 123 S.Ct. 1140 ("Any number of governmental programs might deter crime without imposing punishment. ‘To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" ... would severely undermine the Government's ability to engage in effective regulation.’ " (quoting Hudson, 522 U.S. at 105, 118 S.Ct. 488 )); Millard, 971 F.3d at 1183 ("[D]eterrent purpose alone is not enough to render a regulatory scheme criminal in nature."). Therefore, I do not find the deterrent purpose of the statute to be persuasive evidence that it is punitive.
¶23 Moreover, I would conclude that the punishment imposed at sentencing promotes retribution and deterrence, but the separate registration requirement does not. In other words, the traditional aims of deterrence and retribution are achieved by our traditional forms of sentencing: delinquent adjudication, probation, parole, out-of-home placement, or commitment to the Department of Human Services.
D. CSORA Is Rationally Connected to Nonpunitive Purposes and Is Not Excessive in Light of Those Purposes
¶24 Relying on a number of studies suggesting juveniles are more amenable to rehabilitation, the majority asserts that mandatory lifetime sex offender registration does not bear a rational connection to CSORA's nonpunitive purposes of public safety and aiding law enforcement. Maj. op. ¶¶ 55-57. Furthermore, the majority concludes that the registration requirements for twice-adjudicated juveniles are excessive in light of CSORA's nonpunitive purposes. Id. at ¶ 56. In reaching these conclusions, the majority makes policy determinations that are better left for the legislature.
¶25 It is uncontested that CSORA has the nonpunitive purposes of protecting the community and aiding law enforcement officials in investigating sex crimes. Requiring a juvenile twice adjudicated delinquent to register for life bears a rational connection to these purposes. T.B ., ¶ 40 ("It cannot be disputed that there is a rational connection between CSORA's registration requirement and public safety."). The test to evaluate this factor does not ask whether the statute has a "close or perfect fit" with its nonpunitive purposes. Smith, 538 U.S. at 103, 123 S.Ct. 1140. Instead, the statute must only bear a rational connection to those nonpunitive purposes. Not surprisingly, the General Assembly concluded that juveniles who have actually recidivated are more likely to recidivate in the future; thus, it made the decision to require lifetime registration in the interest of community safety and law enforcement. Again, that was a policy decision by the General Assembly.8 Therefore, while I might prefer that the statute have greater flexibility for juveniles, I cannot say that the statute is so irrational that it bears no connection to its nonpunitive purposes.
¶26 I would further conclude that CSORA is not excessive in light of its nonpunitive purposes. An evaluation of whether a statute is excessive "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Id. at 105, 123 S.Ct. 1140. Here, the nonpunitive objectives are community safety and assisting law enforcement. In enacting CSORA, the legislature made a conscious decision to impose mandatory lifetime sex offender registration requirements on only those juveniles who have multiple adjudications for unlawful sexual behavior. This subset of offenders who have recidivated suggests that the statute, while perhaps inexact, is nonetheless rationally related to, and not excessive in light of, its nonpunitive purposes. See Millard, 971 F.3d at 1184 ("[T]he Court held [that] states were permitted to impose even very long reporting requirements based on categorical judgments about specific crimes, and that states were not required to evaluate individual risk to avoid a finding that registration acts were excessive in relation to their regulatory purpose." (citing Smith , 538 U.S. at 104, 123 S.Ct. 1140 )).
II. The Legislature Is Best Suited to Address Policy Concerns
¶27 I acknowledge the social science and policy studies explaining that juveniles are more capable of change, and I agree that juveniles' actions are "less likely to be evidence of ‘irretrievably depraved character.’ " Maj op. ¶ 55 (quoting Graham , 560 U.S. at 68, 130 S.Ct. 2011 ). Indeed, T.B. cites persuasive studies addressing reduced rates of juvenile recidivism. And of course, the People cite other studies to instill doubt as to whether juvenile sex offenders are truly less likely to recidivate. However, arguments regarding how likely juveniles are to recidivate, what kind of risk juveniles may pose to community safety, and the impacts of registration on juveniles' lives should inform the General Assembly's policy determinations, not this court's evaluation of CSORA's constitutionality. Thus, I respect the policy implications cited by my colleagues in the majority, but once again, I believe those policy determinations are for the legislature to make.
III. Miller, Graham, and Roper Are Inapposite
¶28 The U.S. Supreme Court has determined that certain punishments constitute cruel and unusual punishment when applied to juveniles. Miller v. Alabama, 567 U.S. 460, 479, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."); Graham , 560 U.S. at 82, 130 S.Ct. 2011 (holding that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"); Roper, 543 U.S. at 578, 125 S.Ct. 1183 (holding that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed"). These cases are different from the present case in a critical way: They analyzed whether universally recognized punishments— the death penalty and life in prison without parole—constitute cruel and unusual punishment. They did not consider whether a nonpunitive regulatory scheme constituted punishment in the first place. Therefore, I don't view them as persuasive in our analysis of whether a nonpunitive statute has an overwhelming punitive effect such that it constitutes punishment.
¶29 The majority disagrees: It relies on three out-of-state cases to suggest that "[a]n offender's status as a juvenile is thus relevant not only to whether a punishment is cruel and unusual for purposes of the Eighth Amendment, but also to whether a statutory scheme is punitive for purposes of the Eighth Amendment." Maj. op. ¶ 41 (emphasis added). While I fully appreciate why a certain punishment—life in prison without the possibility of parole—may become cruel and unusual when applied to juveniles, I cannot make the step in logic that the age of the registrant alone can render something punishment when it was not punishment before. See J.C., 221 Cal. Rptr. 3d at 592 ("That children are less culpable and more capable of change than adults is relevant in determining whether the harshest punishment is appropriate, but it does not establish that sex offender registration is punishment ....").
¶30 The majority further notes that Miller , Graham , and Roper "establish that children are constitutionally different from adults for purposes of sentencing." Maj. op. ¶ 28 (quoting Miller, 567 U.S. at 471, 132 S.Ct. 2455 ). But, in my view, that conclusion is misplaced here. While I recognize that children are constitutionally different for sentencing purposes, registration is not even part of a defendant's (or juvenile's) sentence in the first place. C.M.D., ¶ 17, 452 P.3d at 137 ("Such [sex offender] registration is not part of a defendant's sentence but is instead a collateral civil requirement intended as a public safety measure."); People v. Carbajal, 2012 COA 107, ¶ 37, 312 P.3d 1183, 1189 ("Sex offender registration is not an element of a defendant's sentence ...."); People v. Montaine, 7 P.3d 1065, 1067 (Colo. App. 1999) ("[W]e conclude that the statutory duty to register as a sex offender in Colorado is only a collateral consequence of a defendant's guilty plea.").
¶31 In any event, our juvenile system already recognizes that children are different for sentencing purposes and accounts for those differences well before any mandatory lifetime sex offender registration requirement is imposed. See § 19-2-905, C.R.S. (2020) (requiring presentence investigation to address a number of factors, including the child's family, peer relationships, drug use, and criminal history); Flakes v. People, 153 P.3d 427, 432 (Colo. 2007) ("The purpose [of Colorado's juvenile justice system is] to separate juvenile offenders from adult offenders by creating a special system for the appropriate sanctioning of juveniles who violate the law."). Indeed, our juvenile justice system is premised on the notion that juveniles are different, thus requiring that courts always consider the best interests of the child. § 19-2-102(1), C.R.S. (2020) ("The general assembly further finds that, while holding paramount the public safety, the juvenile justice system shall take into consideration the best interests of the juvenile ....").
¶32 Furthermore, when establishing registration requirements, the General Assembly recognized that juvenile sex offenders are different from adult sex offenders by making juvenile information less publicly available and permitting deregistration for those juveniles who have been adjudicated delinquent once. See §§ 16-22-103(4), - 111(1), (1.5), C.R.S. (2020). The General Assembly draws similar distinctions among adult sex offenders by not allowing certain adult offenders to deregister (e.g., sexually violent predators). These distinctions, however, are policy decisions that only the legislature has the authority to make. Thus, while I agree that children are constitutionally different, I don't agree that such distinctions can transform a nonpunitive statute into a punitive one, especially where the legislature has already made a conscious policy decision and clarified that the purpose of registration is community safety, not punishment.
IV. Conclusion
¶33 I am mindful of the gravity of T.B.'s situation, and I realize that there are challenges associated with sex offender registration. I will even go so far as to say that lifetime sex offender registration for juveniles, without the possibility of deregistration, is unfair. But something being unfair does not mean it is unconstitutional. Hence, I cannot conclude that T.B. has established, by the clearest proof, that the effects of CSORA's registration requirements amount to punishment. In concluding otherwise, I believe the majority usurps the role of the General Assembly by weighing policy considerations and then determining that sex offender registration for juveniles is cruel and unusual punishment. For these reasons, I respectfully dissent.
1 Though this case concerns mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications, we use "mandatory lifetime sex offender registration for juveniles" or similar phrases in this opinion as shorthand.
2 Shortly after the court finalized and voted on this opinion, the People submitted supplemental authority notifying the court that the General Assembly passed House Bill 21-1064 and sent it to the Governor on June 21, 2021. Among other things, House Bill 21-1064 amends CSORA to eliminate mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications. The Governor signed the bill into law on June 24, but it does not take effect until September 1. Because the court's opinion was finalized and because T.B.'s claims are not moot under current law, the court has elected to release this opinion to ensure that T.B. receives a new hearing on his petition to deregister immediately, rather than wait until September 1 for the amended law to take effect.
3 A handful of states, including California and Arizona, established rudimentary sex offender registration programs as far back as 1947. See Lori McPherson, The Sex Offender Registration and Notification Act (SORNA) at 10 Years: History, Implementation, and the Future, 64 Drake L. Rev. 741, 746-48 (2016).
4 SORNA is encompassed within an overarching statutory scheme generally aimed at protecting children from sexual exploitation, violent crime, and child pornography. See Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (codified as amended in scattered sections throughout titles 8, 18, 21, and 34 U.S.C.).
5 Because the original scheme applied only to those "convicted" of certain offenses, it did not encompass juveniles adjudicated delinquent for sex offenses. See People v. Corson, 2016 CO 33, ¶ 47, 379 P.3d 288, 298 ("[A] juvenile adjudication is not a criminal conviction.").
6 In 2006, the General Assembly amended CSORA to add a provision, now codified at section 16-22-115, C.R.S. (2020), providing assistance from the Colorado Bureau of Investigation to local law enforcement agencies in apprehending sex offenders who fail to register. See ch. 219, sec. 1, § 16-22-115, 2006 Colo. Sess. Laws 1005, 1005.
7 Certain offenders must register every three months. See § 16-22-108(1)(d)(I).
8 Because it concluded that CSORA's mandatory lifetime registration requirement constitutes punishment, the division declined to address T.B.'s argument that CSORA creates an impermissible irrebuttable presumption and therefore deprives him of substantive due process. Id. at ¶ 53.
9 We granted review of the following issues:
1. Whether lifetime sex offense registration for juveniles who have been adjudicated at least twice for unlawful sexual behavior constitutes punishment under the Eighth Amendment.
2. Whether mandatory lifetime sex-offender registration for multiple juvenile offenses is facially cruel and unusual punishment under the Eighth Amendment.
10 The Eighth Amendment is applicable to the states through the Fourteenth Amendment. See Robinson v. California , 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).
11 Though we hold that mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications is unconstitutional, we do not perceive our holding as conflicting with the Tenth Circuit's decision in Millard . That case involved an as-applied challenge to CSORA brought by three registered sex offenders, only one of whom was a juvenile at the time of his underlying offense. 971 F.3d at 1179-80. Moreover, that offender had only one juvenile adjudication, so he was not subject to the mandatory lifetime registration requirement that applies to T.B. See id. at 1184 n.11 ("We conclude [that] the Colorado Supreme Court's impending decision in T.B. is inapplicable to [Millard], as none of the [offenders] is a juvenile offender with multiple juvenile sex offenses such that they are subject to lifetime registration. [One offender] is subject to lifetime registration, but for an offense he committed as an adult. And, although [another offender] was a juvenile offender, he had only one sex offense conviction (juvenile or otherwise), so he is eligible to petition for deregistration and is not subject to a lifetime registration requirement." (citation omitted)).
12 The South Carolina Supreme Court recently determined that mandatory lifetime sex offender registration for any offender violates due process if there is not an opportunity to petition to deregister after judicial review. See Powell v. Keel, No. 2019-001063, ––– S.C. ––––, ––––, ––– S.E.2d ––––, 2021 WL 2346055, at *8 (S.C. June 9, 2021). And several other courts have held—outside the context of juvenile offenders—that retroactive application of more onerous, post-Smith sex offender registries violates the U.S. Constitution's prohibition on ex post facto punishments. See, e.g., Does #1-5 v. Snyder, 834 F.3d 696, 705-06 (6th Cir. 2016) ; Doe v. State, 167 N.H. 382, 111 A.3d 1077, 1089-1102 (2015) ; State v. Letalien, 985 A.2d 4, 7 (Me. 2009) ; Commonwealth v. Baker, 295 S.W.3d 437, 439 (Ky. 2009) ; cf. Starkey, 305 P.3d at 1030-31 (determining that the retroactive application of a sex offense registration scheme violated the state's constitutional prohibition on ex post facto punishments); Wallace v. State , 905 N.E.2d 371, 373 (Ind. 2009) (same); Doe v. State, 189 P.3d 999, 1000 (Alaska 2008) (same). Given our focus on the application of CSORA to juvenile offenders, we center our analysis on those cases that have similarly examined sex offender registration of juveniles.
13 The Ohio Supreme Court had already determined sex offender registration to be punitive in a prior case. See C.P., 967 N.E.2d at 734 (citing State v. Williams, 129 Ohio St.3d 344, 952 N.E.2d 1108, 1112 (2011) ). Accordingly, the court proceeded directly to the question of whether the application of the registry requirements to juveniles was cruel and unusual.
14 Because the issue is not before us, we decline to opine on the constitutionality of mandatory lifetime sex offender registration for an offender who was adjudicated delinquent for a sex offense as a juvenile and was subsequently convicted of one or more sex offenses as an adult.
15 See, e.g., § 16-22-110(6)(a) ("The general assembly hereby recognizes ... the public's need to adequately protect themselves and their children from [registered sex offenders] ...."); § 16-22-112(1) (explaining "that persons convicted of offenses involving unlawful sexual behavior have a reduced expectation of privacy because of the public's interest in public safety" and "that the public must have access to" the registry "to allow them to adequately protect themselves and their children from these persons").
16 See, e.g., § 16-22-106(1)(b), (2)(b), (3)(a)(I), (3)(a)(II), (3)(c) (requiring communication between various departments, the CBI, and local law enforcement agencies); § 16-22-110(2), (3.5) (requiring the statewide registry to provide certain information to all criminal justice agencies in the state); § 16-22-115 (providing that "the [CBI] shall share information with local law enforcement agencies[,] ... use analytical resources[,] ... [and] review and analyze all available information" to assist local law enforcement agencies in apprehending a sex offender who has failed to register).
17 Many municipalities across Colorado have imposed residency restrictions, albeit to varying degrees of stringency. See, e.g., Alamosa Code of Ordinances ch. 11, art. III, § 11-54; Alma Mun. Code §§ 16-1-90, 16-19-10; Arvada Code of Ordinances ch. 102, art. II, div. 6, § 102-181; Arvada Land Dev. Code §§ 3-1-3-3, 11-3-3-1; Bennett Mun. Code § 16-2-210; Black Hawk Mun. Code ch. 10, art. XIV, §§ 10-261 to 10-265; Brighton Mun. Code §§ 5-90-10, 5-90-70; Brighton Land Use & Dev. Code § 11.01; Broomfield Mun. Code §§ 17-04-130, 17-04-202; Brush Mun. Code § 16-14-20; Commerce City Mun. Code ch. 5, art. XVIII, § 5-302; Commerce City Mun. Code ch. 12, art. VI, § 12-6010; Commerce City Land Dev. Code art. V, div. 2, § 21-5238; Commerce City Land Dev. Code art. XI., div. 2, § 21-11200, amended by Commerce City, Ordinance No. 2266 (Feb. 15, 2021); Englewood Code of Ordinances §§ 7-3-1 to 7-3-6; Federal Heights Code of Ordinances ch. 70, art. I, § 70-4; Grand Junction Mun. Code § 21.04.020; Greeley Mun. Code tit. 14, ch. 12, §§ 14-381 to -386; Lafayette Code of Ordinances §§ 26-8-1, 26-14-11; Louisville Code of Ordinances §§ 17.08.150, 17.16.140; Littleton City Code §§ 3-23-2, 10-1-2; Superior Mun. Code § 16-1-70; Thornton Code of Ordinances ch. 18, art. IV, div. 5, § 18-228; Thornton Code of Ordinances ch. 18, art. XI, § 18-901; Westminster Code of Ordinances §§ 6-17-1 to -6, 11-4-6; Wheat Ridge Code of Ordinances ch. 26, art. I, § 26-123.
18 See, e.g., Ga. Code Ann. § 42-1-15 (2021); Iowa Code § 692A.114 (2021); Okla. Stat. tit. 57, § 590 (2021).
19 See, e.g., Commerce City Mun. Code ch. 9., art. III, div. 7, § 9-3705 (license to operate a massage business must be denied if the applicant is required to register as a sex offender); Lakewood Mun. Code § 5.41.080 (license to operate non-alcoholic dance club must be denied if applicant is required to register as a sex offender); Yuma Mun. Code § 9.24.020 (registration as a commercial solicitor must be denied if the applicant is required to register as a sex offender).
20 In so concluding, we overrule C.M.D., 2018 COA 172, 452 P.3d 133, J.O., 2015 COA 119, 383 P.3d 69, and People in Interest of J.T., 13 P.3d 321 (Colo. App. 2000), to the extent those decisions are inconsistent with this opinion.
21 See Fla. Stat. § 943.0435(1)(b), (1)(h)(1)(d), (11) (2021) ; Mass. Gen. Laws ch. 6, §§ 178C, 178G (2021); Minn. Stat. § 243.166 (2021) ; Mont. Code Ann. §§ 46-23-502(10), -506 (2021); N.D. Cent. Code § 12.1-32-15 (2021); Tenn. Code Ann. §§ 40-39-202, -207(g)(2) (2021); Va. Code Ann. §§ 9.1-901(A), -910(A) (2021); Wyo. Stat. Ann. §§ 7-19-301(a)(iii), -304 (2021); see also Conn. Gen. Stat. §§ 54-250 to -261 (2021) (juveniles neither expressly included in nor excluded from registration requirements).
22 See Alaska Stat. §§ 12.63.010(a), 100(3) (2021) ; D.C. Code §§ 22-4001(3)(A), 16-2318 (2021) ; Ga. Code Ann. § 42-1-12(a)(10)(C) (2021); Haw. Rev. Stat. § 846E-1 (2021); Ky. Rev. Stat. Ann. § 17.510(6)(b) (West 2021); Me. Stat. tit. 34-A, § 11203 (2021); N.M. Stat. Ann. §§ 29-11A-3, 32A-2-18 (2021) ; N.Y. Correct. Law § 168-a (McKinney 2021), N.Y. Fam. Ct. Act § 380.1 (McKinney 2021) ; W. Va. Code §§ 15-12-2(b), 49-4-103 (2021).
23 See Ala. Code § 15-20A-28(a) (2021) ; Del. Code Ann. tit. 11, § 4123(c)(1) (2021); Fla. Stat. § 943.0435(1)(h)(1)(d) (2021) ; Ind. Code §§ 11-8-8-4.5(b), -7 (2021); La. Stat. Ann. § 15:542(A)(3) (2020); Md. Code Ann., Crim. Proc. § 11-704.1(b) (West 2021); Mich. Comp. Laws §§ 28.722(a), 28.723 (2021) ; Miss. Code. Ann. § 45-33-25 (2021) ; Mo. Rev. Stat. § 589.400(6) (2021) ; Nev. Rev. Stat. § 62F.300 (2021); Ohio Rev. Code Ann. § 2152.86(A) (West 2021); Okla. Stat. tit. 10A, §§ 2-8-102, -104 (2021); 42 Pa. Cons. Stat. §§ 9799.12, 9799.13 (2021); S.D. Codified Laws § 22-24B-2 (2021) ; Vt. Stat. Ann. tit. 13, § 5401(15)(c) (2021); see also 34 U.S.C. § 20911(8).
24 See Iowa Code § 692A.103(3) (2021); Wis. Stat. § 938.34(15m) (2021).
25 Ariz. Rev. Stat. Ann. § 13-3821(D) (2021); Ark. Code Ann. § 9-27-356(j) (2021); Cal. Penal Code § 290.008(d)(1)-(3) (West 2021); Md. Code Ann., Crim. Proc. § 11-704.1(d) ; N.H. Rev. Stat. Ann. §§ 169-B:4(IV)(d), B:19 (2021); N.C. Gen. Stat. § 14-208.30 (2020) ; 11 R.I. Gen. Laws § 11-37.1-4(j) (2020) ; Tex. Code Crim. Proc. Ann. art. 62.101(c)(1) (West 2019); Utah Code Ann. § 77-41-105(3)(a) (West 2021); see also Ala. Code § 15-20A-28(b) -(c) (2021) (providing that registration automatically terminates after ten years for some juvenile offenders and that other offenders are allowed to petition to deregister after twenty-five years); cf. Nev. Rev. Stat. § 62F.340 (2021) (hearing automatically held when a juvenile offender reaches age twenty-one to determine whether the offender should be deregistered); Okla. Stat. tit. 10A, § 2-8-108 (2021) (removing juvenile offender from the registry at age twenty-one unless the district attorney successfully petitions to have the offender moved to the adult registry); Idaho Code § 18-8410 (2021) (same) ; In re Registrant J.G., 169 N.J. 304, 777 A.2d 891, 912 (2001) (providing that registration for offenses committed by juveniles under the age of fourteen in New Jersey terminates upon reaching age eighteen if there is clear and convincing evidence that the juvenile does not pose a threat to others).
26 See 730 Ill. Comp. Stat. 150/3-5 (2021) ; Mich. Comp. Laws § 28.728c (2021) ; Miss. Code Ann. § 45-33-47(2)(g), (3) (2021) ; Mo. Rev. Stat. § 589.401(11), (13) (2021) ; Ohio Rev. Code Ann. § 2152.86(D) (West 2021); Or. Rev. Stat. § 163A.130 (2020); 42 Pa. Cons. Stat. § 9799.17 (2021); S.D. Codified Laws § 22-24B-17 (2021) ; Wash. Rev. Code § 9A.44.143 (2021); see also Powell, ––– S.C. at ––––, ––– S.E.2d ––––, 2021 WL 2346055, at *5 (holding that South Carolina's "lifetime registration requirement is unconstitutional absent any opportunity for judicial review to assess the risk of re-offending").
27 See, e.g., § 16-22-110(6)(a) (noting that the sex offender registry is not intended to and should not be "used to inflict retribution or additional punishment on any person convicted of unlawful sexual behavior").
28 T.B. has faced many of these issues. As his probation officer testified at the first hearing to discontinue registration, T.B.'s sex offender registration has held him back from finding housing and has limited his employment options.
1 As the majority notes, "[s]hortly after the court finalized and voted on this opinion, the People submitted supplemental authority notifying the court that the General Assembly passed House Bill 21-1064 and sent it to the Governor on June 21, 2021. Among other things, House Bill 21-1064 amends CSORA to eliminate mandatory lifetime sex offender registration for offenders with multiple juvenile adjudications. The Governor signed the bill into law on June 24, but it does not take effect until September 1." Maj. op. ¶ 2 n.2. Therefore, I agree that releasing these opinions is necessary.
2 I agree with the majority when it concludes that the legislature did not intend for CSORA to be punitive. Maj. op. ¶ 46. The statute clearly indicates that "it is not the general assembly's intent that the information be used to inflict retribution or additional punishment." §§ 16-22-110(6), -112(1), C.R.S. (2020). Accordingly, I focus my analysis on the effects prong of the Mendoza-Martinez test.
3 I recognize that my dissent consists, in large part, of string cites, but that is emblematic of the fact that the case law overwhelmingly demonstrates that registration requirements are not punishment. It is irrefutable that courts across the country—including the U.S. Supreme Court—have analyzed registration requirements under the exact same framework we apply today, and they have almost universally concluded that registration is not punishment.
4 Because I agree with the majority's analysis of scienter, see maj. op. ¶ 48, and whether the underlying conduct that triggers registration is a crime, see id. at ¶ 54, I do not address those factors here.
5 Employers and landlords can access the records of only those juveniles twice adjudicated delinquent for unlawful sexual behavior, and only if the locale where the juvenile is registered chooses to make such information available, or if the employer or landlord affirmatively requests such information.
6 The Colorado Bureau of Investigation may not publish juvenile information on its website. See § 16-22-111(1), (1.5), C.R.S. (2020). Local law enforcement agencies, however, may choose to post such information for juveniles twice adjudicated delinquent, and residents of a locale may request such records from law enforcement. § 16-22-112(2)(b).
7 The Court discussed traditional shame-based punishments, which required offenders to "stand in public with signs cataloguing their offenses," or at times, making such labels permanent by branding individuals with a label indicating their crime. Smith, 538 U.S. at 97-98, 123 S.Ct. 1140 (quoting Adam J. Hirsch, From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts, 80 Mich. L. Rev. 1179, 1226 (1982)); see also id. at 98, 123 S.Ct. 1140 ("A murderer might be branded with an ‘M,’ and a thief with a ‘T.’ "). The differences between having a name on an online registry and these historical, shame-based punishments speak for themselves.
8 As I explain below, the social science and policy studies presented to this court are better suited for the General Assembly. They are not appropriate materials for determining whether CSORA is punitive.