1
 2026 CO 24 Timothy Paul Beagle, Petitioner v. The People of the State of Colorado, Respondent No. 24SC154Supreme Court of Colorado, En BancApril 27, 20262
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 22CA594.
 
 
          
 Attorneys for Petitioner: Megan A. Ring, Public Defender
 Kevin M. Whitfield, Deputy Public Defender.
 
 
          
 Attorneys for Respondent: Philip J. Weiser, Attorney General
 Jaycey DeHoyos, Assistant Attorney General.
 
 
          
 Attorneys for Amicus Curiae ACLU of Colorado: Timothy R.
 Macdonald, Sara Neel, Emma Mclean-Riggs.
 
 
          
 OPINION
 
 
          
 BOATRIGHT, JUSTICE.
 
 3
 
          ¶1
 At sentencing, the district court designated Timothy Paul
 Beagle as a sexually violent predator ("SVP"). On
 appeal, Beagle argued that his SVP designation constituted
 cruel and unusual punishment in violation of the Eighth
 Amendment to the United States Constitution. A division of
 the court of appeals rejected this argument based on our
 precedent in Allen v. People, 2013 CO 44, ¶ 7,
 307 P.3d 1102, 1105, which stated that an SVP designation
 "is not punishment." People v. Beagle, No.
 22CA594, ¶ 24 (Jan. 4, 2024). We granted certiorari to
 consider (1) whether the SVP designation constitutes criminal
 punishment under the Eighth Amendment, and (2) if so, whether
 it is cruel and unusual as applied to Beagle.[1]
 
 
          ¶2
 Because we determine that the General Assembly did not intend
 for the SVP designation to be punishment and the
 designation's punitive effects do not outweigh this
 nonpunitive intent by the "clearest proof," we hold
 that the SVP designation and its accompanying requirements do
 not constitute punishment
 
 4
 
 under the Eighth Amendment.[2] We thus affirm the judgment of
 the court of appeals.
 
 
          I.
 Background
 
 
          A.
 Facts and Procedural History
 
 
          ¶3
 In July 2019, Beagle, who was forty-nine years old, picked up
 two sixteen-year-old girls who had run away from a treatment
 facility and allowed them to stay in his home for ten days.
 During this time, Beagle provided the two girls with drugs,
 repeatedly made sexual advances towards them, and sexually
 assaulted one of them.
 
 
          ¶4
 Beagle pleaded guilty to attempted sexual assault and
 distributing a controlled substance to a minor. An evaluator
 from the Sex Offender Management Board ("SOMB")
 conducted an assessment using the Sexually Violent Predator
 Assessment Screening Instrument ("SVPASI"), which
 suggested that Beagle met the criteria of an SVP. In
 particular, Beagle's Sex Offender Risk Scale
 ("SORS") score was 34.8, more than twelve points
 over the threshold to be classified as an SVP. Colo.
 Dep't of Pub. Safety, Div. of Crim. Just., 2023
 SVPASI Handbook: Sexually Violent Predator Assessment
 Screening Instrument 10-15 (Oct. 2023), https://
 cdpsdocs.state.co.us/ors/docs/Risks/SVPASIHandbook.pdf
 [https://perma.cc/
 
 5
 
 5REY-K8AP] ("SVPASI Handbook"). The
 district court found that Beagle met the SVP criteria and
 designated him as an SVP. The court moreover found that the
 SVP designation "is not punishment" and instead
 that its "stated purpose is to protect the
 community." The district court sentenced Beagle to a
 total of fifteen years in the custody of the Department of
 Corrections. Beagle appealed the district court's order
 designating him as an SVP.
 
 
          ¶5
 A division of the court of appeals affirmed, finding that the
 SVP designation was not "punishment" under the
 Eighth Amendment. Beagle, ¶ 24. The division
 rejected Beagle's argument that Allen, ¶ 7,
 307 P.3d at 1105—which stated that an SVP designation
 "is not punishment"—was abrogated by
 People in Interest of T.B., 2021 CO 59, ¶ 73,
 489 P.3d 752, 772—which held that mandatory lifetime
 registration as applied to juvenile sex offenders was cruel
 and unusual punishment. Beagle, ¶ 24. While the
 division stated that there was "arguable tension"
 between Allen and T.B., it determined that
 T.B. did not "expressly overrule"
 Allen because the cases "d[id] not address the
 same issue." Beagle, ¶¶ 23-24. Thus,
 the division applied Allen and held that
 Beagle's SVP designation was likewise not punishment.
 Id. at ¶ 24. We granted Beagle's petition
 for certiorari.
 
 6
 
          B.
 The "Sexually Violent Predator" Designation in
 Colorado
 
 
          ¶6
 The SVP designation is a heightened classification of sex
 offender which carries the additional requirement of lifetime
 registration under the Colorado Sex Offender Registration Act
 ("CSORA"), §§ 16-22-101 to -115, C.R.S.
 (2025), and requires law enforcement to carry out additional
 community notification protocols. The SVP designation and its
 associated requirements draw from four different sources.
 
 
          ¶7
 First, section 18-3-414.5, C.R.S. (2025), of the
 Criminal Code identifies the criteria for the SVP
 designation. To be designated as an SVP, an offender must (1)
 be eighteen years of age or older when the offense is
 committed; (2) be convicted of an enumerated sex offense or
 an attempt, solicitation, or conspiracy thereof; (3) have
 committed this offense against a victim who was a stranger to
 the offender or who was a person with whom the offender
 established or promoted a relationship primarily for the
 purpose of sexual victimization; and (4) be likely to commit
 another qualifying sex offense based on the results of the
 SVPASI. § 18-3-414.5(1)(a)(I)-(IV), (2).
 
 
          ¶8
 Second, section 16-11.7-103, C.R.S. (2025), of the
 Code of Criminal Procedure creates the SOMB and delegates the
 creation of the SVPASI to this consultative body. The SOMB is
 comprised of twenty-five experts in "adult and juvenile
 issues relating to persons who commit sex offenses,"
 including mental health
 
 7
 
 professionals, law enforcement, criminal defense attorneys,
 and judges, among others. § 16-11.7-103(1).
 
 
          ¶9
 In cases concerning convicted adult sex offenders, a
 SOMB-trained evaluator administers the SVPASI, which is
 designed to identify sex offenders who are likely to commit
 another sexual assault. § 16-11.7-103(4)(d); SVPASI
 Handbook, at 1, 3. Using the SVPASI, an evaluator can
 find that an offender is likely to reoffend in one of three
 ways: (1) the offender has been previously convicted of at
 least one felony sex offense or two misdemeanor sex offenses;
 (2) the offender scores above a twenty-two on the SORS; or
 (3) the offender meets certain psychopathy or personality
 disorder criteria. SVPASI Handbook, at 10-15.
 
 
          ¶10
 The SORS formula assesses the risk that sex offenders will
 have "a new sex or violent court filing within eight
 years of a conviction" for a qualifying SVP offense.
 Id. at 12. SORS predicts that those who score above
 a twenty-two on the assessment fall into a risk group with a
 50-60% likelihood of reoffending.[3] Id. The SORS
 formula considers (1) the number of adult criminal cases
 filed; (2) the number of juvenile delinquency cases filed;
 (3) the number of cases with a revocation from probation or
 community corrections; and (4) the earliest sex
 
 8
 
 offense filing age.[4] Id. at 12-13. The legislature has
 directed the SOMB to revise the SORS formula to accommodate
 updated research "as appropriate." §
 16-11.7-103(4)(d)-(e).
 
 
          ¶11
 After the evaluator completes the SVPASI, the district court
 uses the results as a "primary aid" to determine
 whether the offender qualifies for an SVP designation under
 the criteria in section 18-3-414.5(1)(a). Allen,
 ¶¶ 15, 17, 307 P.3d at 1107-08.
 
 
          ¶12
 Third, CSORA features registration rules unique to
 those designated as SVPs. Once designated as an SVP, an
 offender is required to register every three months "for
 the remainder of [their] natural life," §
 16-22-108(1)(d)(I), C.R.S. (2025), and they may not petition
 for removal from those requirements, § 16-22-113(3)(a),
 C.R.S. (2025).
 
 
          ¶13
 Fourth and finally, the Code of Criminal Procedure
 delineates additional community notification procedures for
 SVPs. § 16-13-904, C.R.S. (2025); § 16-13-905(1),
 C.R.S. (2025). Because SVPs have been determined to pose a
 "high enough level of risk" to their communities,
 § 16-13-901, C.R.S. (2025), each local law enforcement
 agency must implement the SOMB's community notification
 protocols for any SVP who lives within its jurisdiction.
 §§ 16-13-904, -905(1).
 
 9
 
 Currently, these protocols require law enforcement to use
 either a town-hall style meeting, or alternative methods like
 social media, to provide community members with
 "relevant information" about SVPs living in their
 community. Colo. Dep't of Pub. Safety, Div. of Crim.
 Just., SOMB Criteria, Protocols and Procedures for
 Community Notification Regarding Sexually Violent
 Predators 13 (Apr. 2021),
 https://dcj.colorado.gov/sites/dcj/files/documents/SVP%20Criteria%20Protoc
 ols%20and%20Procedures%202021.pdf
 [https://perma.cc/RZR6-EXWJ] ("SOMB Criteria,
 Protocols and Procedures for Community
 Notification").
 
 
          II.
 Analysis
 
 
          ¶14
 We first lay out the appropriate standard of review in this
 case. Then, we summarize the legal principles for assessing
 whether a law constitutes punishment under the Eighth
 Amendment. From there, we assess the SVP designation's
 statutory features, applying Ellingburg v. United
 States, 146 S.Ct. 564 (2026), to find that the
 legislature did not intend the SVP designation to be
 punishment. Finally, applying the seven factors laid out in
 Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69
 (1963), we determine that the effects of the SVP
 designation are not so punitive that the scheme, by the
 "clearest proof," overrides this nonpunitive
 intent. In so doing, we hold that the SVP designation and its
 accompanying requirements do not constitute punishment under
 the Eighth Amendment.
 
 10
 
          A.
 Standard of Review
 
 
          ¶15
 We review constitutional questions de novo. Lucero v.
 People, 2017 CO 49, ¶ 13, 394 P.3d 1128, 1131. We
 also review questions of statutory interpretation de novo.
 Dubois v. People, 211 P.3d 41, 43 (Colo. 2009).
 Statutes are entitled to a presumption of constitutionality;
 thus, under our separation-of-powers doctrine, we will not
 declare a statute unconstitutional without a showing that it
 is unconstitutional beyond a reasonable doubt. T.B.,
 ¶ 25, 489 P.3d at 760.
 
 
          B.
 Legal Principles
 
 
          ¶16
 The Eighth Amendment to the United States Constitution
 provides that "[e]xcessive bail shall not be required,
 nor excessive fines imposed, nor cruel and unusual
 punishments inflicted." U.S. Const. amend.
 VIII.[5] The Colorado Constitution likewise bars
 "cruel and unusual punishments." Colo. Const. art.
 II, § 20. Evaluating whether a law constitutes
 "cruel and unusual punishment" requires us to
 determine if it imposes punishment in the first place.
 Millard v. Camper, 971 F.3d 1174, 1181 (10th Cir.
 2020); see also Ellingburg, 146 S.Ct. at 566
 (explaining that whether a measure is criminal punishment is
 a "threshold question" to a similar constitutional
 challenge under the Ex Post Facto Clause).
 
 11
 
          ¶17
 Whether a law imposes criminal punishment presents "a
 question of statutory construction" that requires a
 court to first "consider the statute's text and its
 structure" to determine whether the legislature
 intended the statute to be punitive.
 Ellingburg, 146 S.Ct. at 566-67 (quoting Smith
 v. Doe, 538 U.S. 84, 92 (2003)). If the "text and
 structure" demonstrate that the legislature intended
 "'to impose punishment,' that 'ends the
 inquiry.'" Id. at 568 (quoting
 Smith, 538 U.S. at 92).
 
 
          ¶18
 However, even if a court determines that the legislature
 intended the statute to be nonpunitive, a measure may still
 be considered punishment if the challenging party establishes
 by the "clearest proof" that the measure's
 punitive effects outweigh this nonpunitive intent.
 Id. at 567 n.1 (quoting Kansas v.
 Hendricks, 521 U.S. 346, 361 (1997)); Smith,
 538 U.S. at 92. Analysis of a statute's punitive effects
 has traditionally taken place via the seven factors laid out
 in Mendoza-Martinez. See, e.g.,
 Smith, 538 U.S. at 97.
 
 
          C.
 Intent
 
 
          ¶19
 Beagle maintains that the General Assembly intended for the
 SVP designation to be punishment because it is partially
 housed in the Criminal Code and does not otherwise have a
 legislative declaration espousing a nonpunitive
 
 12
 
 purpose.[6] Additionally, he argues that by placing
 the SVP designation "near" the section defining
 "[h]abitual sex offenders against children," §
 18-3-412, C.R.S. (2025), the legislature communicated a
 punitive intent akin to this criminal sentence enhancement.
 Moreover, he contends that the SVP designation is "part
 of a criminal sentence," indicating punitive intent,
 because the SVPASI evaluation is conducted "as a part of
 the [presentence investigation]" and because the
 designation itself is entered on the mittimus.
 
 
          ¶20
 Following oral argument here, the U.S. Supreme Court
 announced Ellingburg. Beagle submitted
 Ellingburg as a supplemental authority, deeming it
 relevant to his claim that the legislature intended for the
 SVP designation to be punishment. In Ellingburg, the
 Court analyzed the "text and structure" of the
 Mandatory Victims Restitution Act ("MVRA") and
 found that Congress intended the statute to be criminal
 punishment. 146 S.Ct. at 569. In so doing, the Court
 identified several statutory features of the MVRA which
 "ma[de] abundantly clear" that, when "viewed
 as a whole," the act imposed punishment. Id. at
 567. These features included: (1) the MVRA "label[ing]
 restitution as a 'penalty' for a criminal
 'offense'"; (2) restitution being imposed during
 sentencing; (3) the government, not the victim, being the
 party adverse to the defendant when
 
 13
 
 restitution is ordered; (4) allowing restitution for
 misdemeanors to be imposed "'in lieu of'"
 other punishments, such as imprisonment, making it the
 "sole punishment" for those offenses; (5) allowing
 noncompliance with restitution payments to result in a court
 modification of supervised release, probation, or even
 imprisonment; and (6) the MVRA being codified in the criminal
 code. Id. at 567-68 (quoting 18 U.S.C. §
 3663A(a)(1)).
 
 
          ¶21
 To be sure, the SVP designation scheme shares some of the
 statutory features identified by Ellingburg: the SVP
 designation is imposed at sentencing; the People remain an
 adverse party; the designation is located in the criminal
 code; and compliance with sex-offender registration is often
 a condition of probation or parole, so noncompliance could
 result in a modification of such terms.
 
 
          ¶22
 But, the SVP designation definitively lacks the remaining two
 statutory features identified in Ellingburg: it is
 not labeled a penalty for a criminal offense, and it is not
 imposed "in lieu of" other punishments.
 
 
          ¶23
 While the MVRA labeled restitution as a "penalty,"
 id. at 567 (quoting 18 U.S.C. § 3663A(a)(1)),
 nowhere in the SVP scheme is the designation or any of its
 associated requirements labeled a "penalty." To the
 contrary, section 16-22-112(1), C.R.S. (2025), explicitly
 states that community notification under CSORA should not
 "be used to inflict retribution or additional punishment
 on any person." Moreover, the additional community
 notification requirements for SVPs
 
 14
 
 under sections 16-13-901 to -906, C.R.S. (2025), are
 accompanied by a clear legislative declaration emphasizing
 that such community notification "should only occur in
 cases involving a high degree of risk to the community"
 and should focus on "providing additional
 information and education to the community."
 § 16-13-901 (emphasis added). This indicates that the
 legislature intended the SVP designation to protect and
 educate communities, not punish offenders.
 
 
          ¶24
 Additionally, the Court in Ellingburg explained
 that, per the MVRA, restitution may be imposed "'in
 lieu of'" misdemeanor punishments, "making
 restitution the sole punishment for a federal offense in
 certain circumstances." 146 S.Ct. at 567 (quoting 18
 U.S.C. § 3663A(a)(1)). Not so with the SVP designation.
 Unlike the MVRA, there is no language in section 18-3-414.5
 itself, nor in the relevant sentencing provisions, §
 18-1.3-406, C.R.S. (2025), that allows a sentencing court to
 replace any portion of a defendant's sentence
 with the SVP designation.
 
 
          ¶25
 Ellingburg's "viewed as a whole"
 language implies totality of the circumstances review, 146
 S.Ct. at 567, whereby this court should not seek to
 "mechanically tally" factors, People v.
 McIntyre, 2014 CO 39, ¶ 20 n.2, 325 P.3d 583, 588
 n.2. Evaluating the statutory features identified in
 Ellingburg, we are particularly persuaded by the
 fact that the legislature did not label the SVP designation
 as a penalty and that it even made assurances to the contrary
 in two
 
 15
 
 different legislative declarations. Thus, when "viewed
 as a whole," the features of the SVP designation do not
 indicate punitive intent. See Ellingburg, 146 S.Ct.
 at 567.
 
 
          ¶26
 Next, we turn to the seven Mendoza-Martinez factors
 to consider whether the punitive effects of the SVP
 designation sufficiently outweigh the legislature's
 nonpunitive intent.
 
 
          D.
 Effects
 
 
          ¶27
 In arguing that the SVP designation's punitive effects
 override any lack of punitive intent under
 Mendoza-Martinez, Beagle relies on our determination
 in T.B. that lifetime sex-offender registration for
 juveniles constituted punishment. T.B., ¶ 43,
 489 P.3d at 765. He contends that the effects of the SVP
 designation and its associated requirements are at least as
 punitive as the scheme in T.B.; meaning, the SVP
 designation is likewise punishment.
 
 
          ¶28
 To analyze whether a measure is punitive in effect, courts
 have considered the seven factors articulated in
 Mendoza-Martinez; namely, whether a measure: (1)
 "involves an affirmative disability or restraint";
 (2) "has historically been regarded as a
 punishment"; (3) "comes into play only on a finding
 of scienter"; (4) "promote[s] the traditional aims
 of punishment—retribution and deterrence"; (5)
 applies to behavior which is already a crime; (6) has
 "an alternative purpose to which it may rationally be
 connected"; and (7) "appears excessive in relation
 to
 
 16
 
 the alternative purpose assigned." 372 U.S. at 168-69.
 These seven factors are "'neither exhaustive nor
 dispositive,'" but are instead "'useful
 guideposts,'" that are "designed to apply in
 various constitutional contexts." Smith, 538
 U.S. at 97 (first quoting United States v. Ward, 448
 U.S. 242, 249 (1980); and then quoting Hudson v. United
 States, 522 U.S. 93, 99 (1997)).
 
 
          ¶29
 We first compare this case to both Allen and
 T.B. and deem neither controlling. Then, we apply
 these Mendoza-Martinez factors.
 
 
          1.
 Neither Allen nor
 T.B. Controls This Analysis
 
 
          ¶30
 Beagle challenges the division's reliance on
 Allen, which stated that the SVP designation
 "is not punishment," ¶ 7, 307 P.3d at 1105, to
 hold that the SVP designation was not punishment; he points
 out that Allen did not involve an Eighth Amendment
 challenge and thus did not implicate the
 Mendoza-Martinez factors. Instead, Beagle compares
 his case to T.B., which held that CSORA's
 lifetime registration and community notification
 requirements, as applied to juveniles, were punishment under
 Mendoza-Martinez. T.B., ¶ 43, 489 P.3d
 at 765.
 
 
          ¶31
 We agree that Allen is distinguishable.
 Allen considered whether a trial court had erred by
 designating an offender as an SVP even though the offender
 did not score high enough on the SVPASI to meet the
 criterion. ¶¶ 2-3, 307 P.3d at 1104-05. Thus, the
 issue in Allen was whether and to what extent trial
 courts may deviate from the SVPASI in making an SVP
 determination, not whether the
 
 17
 
 SVP designation was punishment under the Eighth Amendment.
 Id. at ¶ 5, 307 P.3d at 1105. So, we had no
 occasion to analyze the Mendoza-Martinez factors.
 Our remark in Allen that the SVP designation is not
 punishment is not dispositive.[7]
 
 
          ¶32
 Turning to T.B., although that case addressed a
 similar issue involving a juvenile, it does not control our
 conclusion here. In cases that walk through the seven
 Mendoza-Martinez factors, there will often be some
 tension between opinions due to differences between statutory
 schemes. Therefore, our analysis must not adopt, without
 examination, the conclusions of similar cases, such
 as that of T.B. Prior cases addressing similar
 statutory schemes, though instructive, are not binding, and
 we must instead conduct our own analysis of a measure's
 punitive effects using a consistent and thoughtful review of
 the seven Mendoza-Martinez factors.[8]
 
 18
 
          ¶33
 Upon review, we view T.B. as distinguishable for two
 reasons. First, T.B. analyzed lifetime sex-offender
 registration as applied to juveniles. ¶ 2, 489
 P.3d at 755-56. Under the seventh Mendoza-Martinez
 factor, we deemed lifetime registration for juveniles
 excessive because it (1) "brands juveniles as
 irredeemably depraved based on acts committed before reaching
 adulthood," (2) disregards juveniles'
 "tremendous capacity" for reform, and (3) applies
 for a greater percentage of a juvenile's life by the
 "very fact of an offender's youth."
 Id. at ¶¶ 2, 32, 489 P.3d at 755-56, 762.
 We also judged inapposite Smith, in which the
 Supreme Court held that the sex-offender notification
 requirements at issue did not constitute public shaming
 because they involved the "dissemination of accurate
 information about a criminal record, most of which is already
 public." T.B., ¶ 52, 489 P.3d at 767
 (quoting Smith, 538 U.S. at 98). We emphasized that
 this rationale did not necessarily apply in the juvenile
 context, and so "[t]he dissemination of information
 about juvenile sex offenders thus appears more
 punitive in light of the presumptive confidentiality of most
 other juvenile adjudications." Id. (emphasis
 added).
 
 
          ¶34
 Second, in T.B., we determined that CSORA's
 automatic lifetime registration requirement for repeat
 juvenile offenders was retributive under the fourth
 Mendoza-Martinez factor because there was no
 individualized risk assessment. T.B., ¶ 74, 489
 P.3d at 772.
 
 19
 
          ¶35
 In contrast, here, the SVP designation applies only to adult
 offenders, § 18-3-414.5(1)(a)(I), whose conviction
 information is already a matter of public record. Moreover,
 the designation only applies to such offenders after
 the completion of an individualized risk assessment via the
 SVPASI. § 16-11.7-103(4)(d).
 
 
          ¶36
 Therefore, neither Allen nor T.B.
 explicitly addressed the issue presented here: whether the
 SVP designation or its associated requirements is criminal
 punishment under the Eighth Amendment. The ultimate question
 remains whether the punitive effects of the law are so severe
 as to override the legislature's nonpunitive intent by
 the "clearest proof," an analysis we approach by
 weighing the seven Mendoza-Martinez factors.
 
 
          2.
 The Seven Mendoza-Martinez
 Factors
 
 
          ¶37
 Applying the seven Mendoza-Martinez factors to this
 case, we conclude that two of them weigh in favor of finding
 the SVP designation punitive, one is neutral, and four weigh
 against.
 
 
          ¶38
 We begin with the two factors weighing toward punishment.
 First, as we acknowledged in T.B., there are ways
 that the sex-offender registration and community notification
 programs here resemble a historical form of
 punishment—namely, public shaming and humiliation.
 ¶ 52, 489 P.3d at 767.
 
 20
 
          ¶39
 Specifically, Beagle maintains that community notification
 via a town-hall meeting resembles public
 shaming.[9] And, in its amicus brief, the American
 Civil Liberties Union of Colorado ("ACLU") takes
 issue with the alternative to a townhall meeting most often
 employed by localities, where police departments publish the
 required information to their Facebook pages. The ACLU claims
 that this "functions as a state-sanctioned platform for
 the public to shame and threaten SVP-designated people"
 given that the comment sections "are filled with vitriol
 and threats."
 
 
          ¶40
 Although we acknowledge this argument, we also note that it
 carries limited contextual weight. Public shaming is
 typically understood to involve confrontation that is both
 "direct" and "face-to-face,"
 Smith, 538 U.S. at 98, yet nothing in the community
 notification statute mandates such face-to-face
 confrontation, see §§ 16-13-904, -905. In
 fact, SVPs are not to be permitted to attend the community
 notification meetings, eliminating the risk of any
 face-to-face confrontation. SOMB Criteria, Protocols and
 Procedures for Community Notification, at 49.
 Additionally, any shaming that occurs via "vitriol and
 threats" in the comment sections of social media posts
 is not government sponsored. The statute
 
 21
 
 only requires the SOMB to ensure that community notification
 occurs, § 16-13-904(2), and the SOMB itself provides
 municipalities with numerous options—including posting
 on social media—to provide that notice. The fact that
 some community members choose to leave these types of
 comments does not transform community notification into
 "public shaming."
 
 
          ¶41
 Second, under the fifth Mendoza-Martinez factor, the
 SVP designation only applies to behavior that is already a
 crime, given that it is imposed on those who have been
 convicted of a sex offense. § 18-3-414.5(1)(a)(II).
 
 
          ¶42
 As we mentioned, one factor is neutral to our analysis here:
 whether the law involves an affirmative disability or
 restraint. We recognize that the burdens of CSORA's
 registration requirements—in particular their lifetime
 span—impose certain restraints. But the U.S. Supreme
 Court has set a high bar for what constitutes an affirmative
 disability or restraint, generally comparing measures against
 the "'infamous punishment' of
 imprisonment." Hudson, 522 U.S. at 104 (quoting
 Flemming v. Nestor, 363 U.S. 603, 617 (1960)). In
 Smith, the Court found that Alaska's lifetime
 sex-offender registration requirements did not constitute an
 affirmative disability or restraint because they did not
 "resemble imprisonment, the paradigmatic affirmative
 disability or restraint." 538 U.S. at 86 (citing
 Hudson, 522 U.S. at 104). And, while Beagle argues
 that the designation resembles parole or probation,
 Smith distinguished parole or probation from
 Alaska's SVP
 
 22
 
 scheme—where offenders were "free to move where
 they wish and to live and work as other citizens, with no
 supervision." Id. at 87. Colorado's SVP
 scheme similarly does not restrict SVPs to the same degree as
 parole or probation.
 
 
          ¶43
 The other arguments that Beagle makes regarding why he
 believes the SVP designation is an affirmative disability or
 restraint are unpersuasive. Namely, any threats to employment
 or housing are not removed in the absence of the SVP
 designation and registration scheme. These are collateral
 consequences stemming from the very nature of the underlying
 conviction. As the U.S. Supreme Court noted in
 Smith, both landlords and employers often conduct
 criminal background checks on prospective tenants and
 employees. Id. at 100. As we see it, "these
 consequences flow not from" the SVP designation, but
 "from the fact of conviction, already a matter of public
 record." Id. at 101. Thus, we see this factor
 as weighing, at most, neutrally in our analysis
 here.[10]
 
 
          ¶44
 The remaining four Mendoza-Martinez factors
 definitively weigh against considering the SVP designation as
 punishment.
 
 23
 
          ¶45
 First, the SVP designation does not require a finding of
 scienter. The SVP designation is imposed based on the results
 of the SVPASI, which itself considers many factors, see
 supra Part I.B., but not, in any way, the intent of a
 defendant.
 
 
          ¶46
 Second, the SVP designation's operation does not
 necessarily promote the traditional aims of "retribution
 and deterrence." Mendoza-Martinez, 372 U.S. at
 168. Beagle argues that the SVP designation is retributive
 because it is imposed for life, meaning it is not tied to a
 "current or reevaluated individualized risk
 assessment" and is instead imposed as "retribution
 for a past offense."
 
 
          ¶47
 But the fact that the SVP designation requires an
 individualized risk assessment in the first place strongly
 supports the conclusion that the designation is not
 retributive. In the context of sex offender statutory
 regimes, the existence of an individualized risk assessment
 makes it less likely that the scheme is retributive because
 such a tool seeks to measure the "danger of
 recidivism" rather than impose punishment based on the
 "'extent of the wrongdoing.'"
 Smith, 538 U.S. at 102 (quoting Doe I v.
 Otte, 259 F.3d 979, 990 (9th Cir. 2001)).
 
 
          ¶48
 In Smith, the Supreme Court found that Alaska's
 sex-offender registration requirements, which differentiated
 between "individuals convicted of aggravated or multiple
 offenses and those convicted of a single, nonaggravated
 offense," were not retributive because they were
 "reasonably related to the danger of recidivism."
 Id. at 102. Likewise, in Hendricks, the
 Court concluded that a commitment
 
 24
 
 determination under Kansas's Sexually Violent Predator
 Act was not retributive even when it considered evidence of
 an offender's past sexually violent behavior because it
 "does not affix culpability for prior criminal
 conduct." 521 U.S. at 362. Instead, the Court noted that
 the Act considered past conduct explicitly for the purposes
 of determining "future dangerousness." Id.
 Similarly, Colorado's SVP designation scheme is
 always accompanied by an individualized risk
 assessment tool, the SVPASI, to determine an offender's
 "danger of recidivism" rather than to impose
 retribution.
 
 
          ¶49
 Neither does the SVP designation sufficiently promote the
 traditional aim of "deterrence" as conveyed by the
 fourth Mendoza-Martinez factor. Given that
 "[a]ny number of governmental programs might deter crime
 without imposing punishment," the "'mere
 presence'" of a deterrent effect does not alone
 render a regulatory scheme punitive because this
 "'would severely undermine the Government's
 ability to engage in effective regulation.'"
 Smith, 538 U.S. at 102 (quoting Hudson, 522
 U.S. at 105).
 
 
          ¶50
 Beagle does not otherwise demonstrate that the SVP
 designation promotes "deterrence" of sexual
 assault. To begin, Beagle's reliance on the Colorado
 Bureau of Investigation's ("CBI") stated goal
 that sex-offender registration in general serves to further
 the "[d]eterrence of sex offenders for committing
 similar crimes," CBI, Registration: Goals of the Sex
 Offender Registry, https://apps.colorado.gov/
 
 25
 
 apps/dps/sor/information.jsf [https://perma.cc/7CUX-DWFP], is
 unavailing because CBI's identified goal related to
 sex-offender registration in general is not dispositive.
 
 
          ¶51
 Furthermore, the SVP designation does not promote the
 traditional aim of deterrence when it advises community
 members about a potentially dangerous individual.
 Registration and community notification alert potential
 victims about an individual designated as an SVP. Thus, we
 see these measures as civil regulatory means principally
 designed to keep a community safe by ensuring that community
 members can take the steps needed to keep themselves safe.
 
 
          ¶52
 Finally, both the sixth and seventh Mendoza-Martinez
 factors—whether a measure is rationally related to a
 nonpunitive purpose and is not excessive regarding that
 purpose—weigh against considering the SVP designation
 as punishment.[11] 372 U.S. at 168-69. In addressing these
 two factors, the issue is not whether the statute has a
 "close or perfect fit" with its nonpunitive
 purpose(s) or whether the legislature "has made the best
 choice possible to address the problem it seeks to
 remedy." Smith, 538 U.S. at 103, 105. The
 question is simply whether
 
 26
 
 "the regulatory means chosen are reasonable in light of
 the nonpunitive objective." Id. at 105.
 
 
          ¶53
 The legislative text associated with the SVP designation
 clearly indicates that this nonpunitive purpose is
 "community protection."[12] See §
 16-22-112(1) (explaining that CSORA aims to provide the
 public "access" to information); § 16-13-901
 (noting that SVPs pose a "high enough level of risk to
 the community" and that community notification is meant
 to spread "information and education to the community
 concerning supervision and treatment of sex offenders").
 
 
          ¶54
 And, the designation and its associated registration and
 notification requirements are rationally related to community
 protection. They are tools that enable law enforcement to
 notify community members about those offenders who reside in
 close proximity to them and are deemed to have the highest
 risk of reoffending.
 
 
          ¶55
 Moreover, the SVPASI is a comparatively well-developed
 individualized risk assessment tool strengthening the SVP
 designation's relationship to community protection and
 lowering the risk that it is excessive by sweeping up only
 those offenders deemed to have the highest risk of
 recidivism. Although
 
 27
 
 Beagle argues that the SORS formula does not accurately
 assess the risk of recidivism on sex offenses
 (because it relies on all past criminal history) and
 otherwise provides no opportunity for reassessment, the SORS
 goes beyond the relatively minimal risk assessment imposed by
 Alaska's scheme, which the Supreme Court held was
 rationally related to "public safety."
 Smith, 538 U.S. at 87. Alaska's sex-offender
 registration scheme only differentiated between individuals
 convicted of multiple or aggravated sex offenses and those
 convicted of a single, nonaggravated sex offense.
 Id. Here, the SORS formula is an evidencebased
 assessment that considers (1) the number of adult criminal
 cases filed; (2) the number of juvenile delinquency cases
 filed; (3) the number of cases with a revocation from
 probation or community corrections; and (4) the earliest sex
 offense filing age. SVPASI Handbook, at 12; see
 supra Part I.B. Further, the SOMB reports that
 "fewer than five percent of those assessed with the SORS
 will score [twenty-two] or more." SVPASI
 Handbook, at 20.
 
 
          ¶56
 While the ACLU and Beagle may raise legitimate concerns
 regarding the statistical accuracy of the SORS and SVPASI to
 identify those offenders with the highest risk of
 reoffending, we cannot cross into the policy-making powers of
 the legislature. The sixth and seventh
 Mendoza-Martinez factors contemplate only
 reasonableness, not statistical precision, and the SORS
 formula's reliance on all past criminal
 history—including violent offenses—to predict
 whether a person
 
 28
 
 will commit another sex offense is reasonable in part because
 sexual violence is likely to be underreported. See,
 e.g., Nicholas Scurich &Richard S. John, The
 Dark Figure of Sexual Recidivism, 37 Behav. Sci. &L.
 158, 158, 161 (2019). We are not tasked with assessing
 whether this approach is perfect, only whether it is
 reasonable.
 
 
          ¶57
 Ultimately, although certain effects of the SVP designation
 may resemble punishment, they do not by the "clearest
 proof" outweigh the legislature's nonpunitive
 intent.
 
 
          ¶58
 Because we determine that the General Assembly did not intend
 for the SVP designation to be punishment and the
 designation's punitive effects do not outweigh this
 nonpunitive intent by the "clearest proof," we hold
 that the SVP designation and its accompanying requirements do
 not constitute punishment under the Eighth Amendment.
 
 
          III.
 Conclusion
 
 
          ¶59
 For the foregoing reasons, we affirm the judgment of the
 court of appeals.
 
 
           CHIEF
 JUSTICE MARQUEZ, joined by JUSTICE GABRIEL, specially
 concurred.
 
 29
 
           CHIEF
 JUSTICE MARQUEZ, joined by JUSTICE GABRIEL, specially
 concurring.
 
 
          ¶60
 Although I join the majority's opinion, I write
 separately to highlight concerns with the sexually violent
 predator ("SVP") designation raised by
 Colorado's Sex Offender Management Board
 ("SOMB") that warrant the General Assembly's
 attention. In the nearly thirty years since it first became
 part of Colorado law, scientific research has called into
 question the effectiveness of the SVP designation in reducing
 recidivism and protecting the public. The SOMB agrees and has
 repeatedly recommended that the General Assembly eliminate
 the SVP designation and replace it with a system better
 aligned with modern research. Given these concerns, I
 respectfully urge the legislature to review the relevant
 research and consider whether the SVP designation continues
 to serve its intended purpose.
 
 
          ¶61
 The SOMB is statutorily charged with creating and maintaining
 the standards for sex offender evaluation and treatment, as
 well as reviewing and reporting on the evolving science in
 this area. § 16-11.7-103(4)(e), C.R.S. (2025). In 2016,
 2019, and 2022, the SOMB made formal recommendations to the
 General Assembly to eliminate the SVP designation entirely
 and replace it with a three-tier system based on an updated
 risk classification system that better aligns with modern
 research. Colo. Dep't of Pub. Safety, Div. of Crim.
 Just., SOMB Annual Legislative Report: Evidence-Based
 Practices for the Treatment and Management of
 
 30
 
 Adults and Juveniles Who Have Committed Sexual
 Offenses 31-33 (Jan. 2016) ("2016 Annual
 Legislative Report"),
 https://cdpsdocs.state.co.us/somb/resources/
 SOMB2016AnnualLegislativeReport.pdf
 [https://perma.cc/8LDX-KKS7]; Colo. Dep't of Regul.
 Agencies, Off. of Pol'y, Rsch. &Regul. Reform,
 2019 Sunset Review: SOMB 38-39 (Oct. 2019)
 ("2019 Sunset Review"),
 https://cdpsdocs.state.co.us/ dvomb/SOMB/WN/2019sunset.pdf
 [https://perma.cc/P3EY-WRVD]; Colo. Dep't of Pub. Safety,
 Div. of Crim. Just., SOMB Annual Legislative Report:
 EvidenceBased Practices for the Treatment and Management of
 Adults and Juveniles Who Have Committed Sexual Offenses
 26-28 (Jan. 2022) ("2022 Annual Legislative
 Report"),
 https://cdpsdocs.state.co.us/dcj/DCJ%20External%20Website/SOMB/Research.Reports/2022%20Legislative%20Report.pdf
 [https://perma.cc/T55L-7FJA].
 
 
          ¶62
 A decade ago, in 2016, the SOMB noted that federal law had
 not required the use of the SVP designation since 2006,
 recommended the elimination of the SVP designation, and
 encouraged exploration of a process to "reassess . . .
 risk classification . . . based upon changes in [recidivism]
 risk over time." 2016 Annual Legislative Report,
 supra, at 32-33. These recommendations align with
 modern research showing that "sex offender recidivism
 risk declines substantially over time as individuals remain
 in the community offense-free." Jill S. Levenson,
 Melissa D. Grady &George Leibowitz, Grand Challenges:
 Social Justice and the Need
 
 31
 
 for Evidence-Based Sex Offender Registry Reform, 43
 J. Socio. &Soc. Welfare 3, 9, 14, 19-20 (June 2016);
 see also Molly J. Walker Wilson, The Expansion
 of Criminal Registries and the Illusion of Control, 73
 La. L. Rev. 509, 520-22 (2013) (collecting and summarizing a
 series of studies on recidivism rates among sex offenders).
 
 
          ¶63
 Three years later, in 2019, the SOMB emphasized again that
 the SVP designation "is no longer accurate in the
 current system"; that "[c]urrent practice
 eliminates the term 'sexually violent predator'"
 altogether; and notably, that "the term may misrepresent
 the risk to the public and is therefore confusing to members
 of the community." 2019 Sunset Review, supra,
 at 38.
 
 
          ¶64
 Most recently, in 2022, the SOMB stressed once again that a
 growing body of research has largely discredited
 classification systems like those in the SVP designation for
 two reasons: (1) they do not accurately assess a person's
 recidivism risk; and (2) mislabeling someone as higher risk
 than they actually are can increase the risk of recidivism by
 depriving individuals of strong social ties and stable
 housing and employment. 2022 Annual Legislative Report,
 supra, at 26-28; see also Kristen M. Zgoba
 &Meghan M. Mitchell, The Effectiveness of Sex
 Offender Registration and Notification: A Meta-Analysis of 25
 Years of Findings, 19 J. Experimental Criminology 71, 90
 (Sep. 2021) ("Maintaining low or reduced risk
 individuals on registries for a lifetime, or barring them
 from petitioning for termination, may promote collateral
 consequences in the form of housing
 
 32
 
 instability, employment instability, and internet bans,
 thereby further increasing their risk of reoffending.");
 Levenson, et al., supra, at 9 (explaining that
 "exclusionary practices activated by shaming labels can
 isolate stigmatized groups from mainstream social life,
 solidifying one's deviant identity and fortifying
 criminal behavior").
 
 
          ¶65
 These consistent concerns flagged by the statutory body
 responsible for sex offender evaluation and treatment
 standards in Colorado raise important questions about whether
 the SVP designation continues to serve its intended purpose.
 Although I join today's opinion, I note these concerns
 and respectfully call the General Assembly's attention to
 them.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following issues:
 
 
 1. Whether the sexually violent predator designation,
 under section 18-3-414.5(1)(a), C.R.S. (2024), is a criminal
 punishment under the Eighth Amendment to the United States
 Constitution.
 
 
 2. Whether the sexually violent predator designation
 is cruel and unusual punishment as applied to
 Petitioner.
 
 
 [2] In light of this disposition, we need
 not consider (1) Beagle's argument that the SVP
 designation is cruel and unusual as applied to him or (2) the
 People's argument that Beagle failed to preserve his
 Eighth Amendment claim.
 
 
 [3] The SORS formula relies on data from
 the Colorado Judicial Branch's ICON Case Management
 Information System. SVPASI Handbook, at 12.
 
 
 [4] "Score = (# Adult Cases x 2.1) +
 (# Juvenile Cases x 3.1) + (# Revocation Cases x 2.2) -
 (Earliest Sex Offense Filing Age x .23)." Id.
 (emphasis omitted).
 
 
 [5] The Eighth Amendment is applicable to
 the states through the Fourteenth Amendment. See,
 e.g., Robinson v. California, 370 U.S. 660, 666
 (1962).
 
 
 [6] The SVP statute itself does not
 include any legislative declaration. See §
 18-3-414.5.
 
 
 [7] And, in fact, then-Justice Marquez
 noted in her concurrence in Allen that the issue of whether
 the SVP designation was criminal punishment "was not
 squarely raised" in that case, and so she would
 "simply assume, without deciding, that an SVP
 designation is not criminal punishment" ¶ 28 n5,
 307 P.3d at 1110 n5 (Marquez, J, concurring in the
 judgment).
 
 
 [8] We acknowledged as much in
 T.B.:
 
 
 The statutory schemes challenged in each of the three
 cases [cited by T.B.], much like the provisions of CSORA
 challenged by T.B., are materially different than the more
 limited registration requirements that the Supreme Court
 addressed in Smith. We thus cannot mechanically apply
 Smith's holding and reasoning without accounting for
 these differences.
 
 
 ¶ 40, 489 P.3d at 764.
 
 
 [9] Beagle also argues that the SVP
 designation resembles "banishment" and
 "parole" under this factor. But his banishment
 argument focuses on municipal residency restrictions, the
 constitutionality of which is not before us. As for parole,
 we later address this vis-a-vis the "affirmative
 disability or restraint" factor.
 
 
 [10] The constitutionality of municipal
 or federal restrictions on SVPs (e.g., residency constraints)
 is not before this court today. We are concerned only with
 the relevant Colorado state law regarding SVPs.
 
 
 [11] The sixth and seventh
 Mendoza-Martinez factors are often discussed in
 tandem given that the concepts of rational connection and
 excessiveness are logically intertwined.
 
 
 [12] Beagle's arguments pointing to
 how the SVP scheme fails to improve offender well-being or
 encourage rehabilitation misinterpret the purpose of the SVP
 designation, which is community protection through education
 and notification, not through offender rehabilitation.
 See § 16-22-112(1); § 16-13-901.
 
 
 ---------